## MERCANTILE HOME BANK & TRUST CO. v. UNITED STATES et al.

### No. 10974.

Circuit Court of Appeals, Eighth Circuit.

April 26, 1938.

Rehearing Denied May 12, 1938.

James P. Kem, of Kansas City, Mo. (J. R. Kaspar and Butler Disman, both of Kansas City, Mo., with him on the brief), for appellant.

Helen R. Carloss, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., Sewall Key and S. Dee Hanson, Sp. Assts. to Atty. Gen., and Maurice M. Milligan, U. S. Atty., and Richard K. Phelps, Asst. U. S. Atty., both of Kansas City, Mo., on the brief), for appellee United States.

Ellison A. Neel, of Kansas City, Mo. (H. H. McCluer, of Kansas City, Mo., on the brief), for appellee United States Fidelity & Guaranty Co.

Before STONE, GARDNER, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

The question to be determined in this case is whether appellant, by reason of having by written contract taken over practically all of the assets of the Home Trust Company while it was in straitened financial circumstances, became liable for the taxes due from such company to the United States. The lower court, in an action at law tried to the court without a jury, held appellant liable. This liability is predicated upon the following facts found by the court, or otherwise appearing from the record:

The Home Trust Company, of Kansas City, Mo., was incorporated as a trust company under the laws of Missouri, and until early in 1933 it did business in Kansas City. In 1932 and in the early part of 1933, the banking situation had become very acute and was in a state of nation-wide panic. In February, 1933, the capital of the Home Trust Company (the taxpayer) and three other Kansas City concerns, the Mercantile Trust Company, the Main Street State Bank, and the Sterling Bank, was seriously impaired. Their deposits were being rapidly withdrawn, and they were threatened with a "run." With the co-operation and assistance of the Kansas City Clearing House and the Reconstruction Finance Corporation, they entered into a contract whereby all their deposit liabilities, their outstanding cashier's and certified checks, and their unpaid wages and current bills were assumed by the appellant, which was incorporated for that purpose. The new concern had a capital of $400,000, fully paid in cash. In consideration of the assumption of the designated liabilities, each of the four banking concerns agreed that the total amount of the debts assumed by appellant should represent a debt and obligation of each to appellant, which each promised to repay with interest on or before February 25, 1938. The tax liabilities of the Home Trust Company and the Home Safe Deposit Company, a subsidiary of Home Trust Company, stock of which was wholly owned by the last-named company, to the United States, were not included in the assumed liabilities. The assumed liabilities were classified in the contract, and following the classification is a provision that: "The aforesaid liabilities and obligations shall constitute the sole and only obligations of the last named four parties to this contract which the new bank shall assume hereunder or in any manner become liable for." The contract refers to certain outstanding obligations or certificates of the Home Trust Company as follows:

| | |
|---|---|
| "Alexander Rieger | $174,000.00 |
| Alexander Rieger | 26,000.00 |
| A. G. Biggerstaff, Trustee | 139,000.00" |

Referring to these obligations, the contract provides: "The New Bank shall, under no circumstances, and in no event, be deemed to have assumed any of the obligations of any of the presently existing banks which are parties to this contract represented by certificates of indebtedness, nor shall the New Bank be deemed to have assumed any other obligations which are not specifically assumed by the New Bank under the terms of this contract."

The new corporation, at the close of business on February 25, 1933, was to open an account against each of the four banks or trust companies, on one side of which was to be entered a charge against it for liabilities assumed. Each of the existing banks or trust companies agreed that at the close of business on February 25, 1933, it would sell, transfer, convey, set over, and deliver to appellant, to become its absolute property, the following assets: (1) All cash on hand; (2) all amounts due it from any bank, banker, or trust company; (3) all

furniture, fixtures, vaults, safe deposit boxes, machines, equipment, supplies, books, records, and all other property used in its business; (4) the capital stock of its safe deposit company, if any, and all outstanding safe deposit contracts.

The contract made provision that the aggregate amount of the cash and the amounts owing the respective banks or trust companies should be credited to their respective accounts and applied as of the close of business February 25, 1933. Accordingly, the Home Trust Company was given credit with the sum of $235,000, the agreed value of its banking premises, fixtures, equipment, and the capital stock of the Home Safe Deposit Company. The difference between the obligations and liabilities assumed and the property sold and conveyed to appellant was considered the balance owing on the debts of each and was secured by a pledge of the remaining assets and property of each of the four banks and trust companies.

The terms of the contract, which was approved by the State Banking Department, have been meticulously observed and carried out. At the time of the execution of the contract and the transfer of the assets, it was thought that the assets pledged were of greater value than the debt for which they were pledged, but at the time of the trial the assets pledged had been proven to be of less value than the debt for which they were pledged as security, and it was estimated that there would be a deficit of from $60,000 to $70,000 in the liquidated account, and the sum of $40,000 had already been charged off as a loss against the account out of earnings of the appellant, the charge-off being made on the demand of the state bank examiner.

The agreement provided that, if there should be any surplus in the assets pledged or turned over as security, as against the liabilities assumed, it would be returned to each of the four original banks and trust companies, and that, if the indebtedness, after five years from the date of the contract, had not been paid in full, the newly formed trust company, appellant herein, should have the right to sell these unliquidated pledged assets to the highest bidder and apply the proceeds upon the payment of the indebtedness.

The Home Trust Company had not been dissolved up to the time of the trial.

The court found that an unusual situation of financial distress confronted these banks and trust companies, and that the purpose of the contract and of the organization of the plaintiff was not only to save these companies from failure, but that it was advantageous to them to take this action to prevent their complete failure, and that what was done by these corporations under this contract was not done in the ordinary course of business, but was unusual and extraordinary.

The depositors of each of these four original corporations were permitted to and did continue business with the new corporation, just as they had done business with the several original trust companies or banks, and whatever deposit credit a depositor had in either of the old institutions was given him in the new institution, and the outstanding checks on the old institutions were honored and paid by the new, and checks issued subsequently on them were likewise honored by it, and deposit books and signature cards of the four original institutions were used by the new institution. The new institution opened for business and continued to use and occupy the bank rooms theretofore occupied and used by the Home Trust Company, and the subsidiary, Safe Deposit Company, continued to do business in its same quarters which it occupied before the opening of the new corporation. Many of the officers of the contracting corporations became officers and directors of the new corporation.

There is no finding that the shareholders of the old corporations became shareholders of the new corporation, and it appears from the record that, in so far as the Home Trust Company is concerned, it had fifty-five shareholders, only one of whom became a shareholder in the new corporation; and it further appears that there were but four shareholders in the new corporation.

The court found that the transfer to the Mercantile Home Bank & Trust Company would and did, as a matter of fact, impair, defeat, or defraud the plaintiff, unless the new corporation became liable for and paid the income tax deficiencies.

A witness called by plaintiff, who was familiar with and participated in the transactions culminating in the execution of the contract, testified: "The situation came to such a point here in Kansas City that something had to be done, not only for the salvation of certain small banks but to save this town from a catastrophe. The question was what to do. The stockholders and officers

of all of these banks had a great deal of pride in their own reputations, the fact that their friends had confided in them and given them money. It was just a case of something as a last resort, and this was thought to be the best thing to do. It was done with the best intentions in the world, with the idea of protecting the people of Kansas City. There was no thought given to the people that owned stock in these banks. The stockholders were willing to sacrifice what they had for the general good of the town, and this action, in the opinion of the best informed minds in Kansas City, had to be taken to save the banks of this town. I don't mean just these four banks, but all the banks, because as this thing went on, it developed and finally culminated in the National Bank Holiday. * * * Now this bank was organized with entirely new capital and I helped to obtain subscriptions myself."

After the transfer from the old corporations to the new, the Home Trust Company continued to exercise its corporate franchise and continued to operate in the way of collecting notes and real estate loans, assets which had been pledged by it to the Mercantile Home Bank & Trust Company but were still owned by the Home Trust Company, subject to the pledgee's rights. It continued to make such reports as were required by law to the state and federal authorities. It paid its annual franchise taxes to the State of Missouri and its annual state corporation taxes every year since February 25, 1933. The directors of that company since that time held regular meetings, and from time to time held informal meetings for the purpose of determining matters of settlement and sale of real estate.

This action was commenced by the United States against the Home Trust Company and the Home Safe Deposit Company to recover deficiency in income taxes. The appellee United States Fidelity & Guaranty Company was made a defendant. The deficiency involved was in the income taxes assessed against the defendants Home Trust Company and Home Safe Deposit Company for the years 1923 and 1924. These taxes had been in litigation which was still pending in this court when the transfer of assets described in the contract was effected. The United States Fidelity and Guaranty Company was surety on a supersedeas bond given on behalf of the Home Trust Company and the Home Safe Deposit Company on appeal of the tax case to this court. This court affirmed the decision of the Board of Tax Appeals on May 11, 1933. Home Trust Co. v. Com'r, 8 Cir., 65 F.2d 532.

After the action had been commenced, on motion of plaintiff, the appellant Mercantile Home Bank and Trust Company was made a party defendant. The petition upon which the action was tried alleges the income tax deficiency of the two corporations, the execution of the supersedeas bond by the United States Fidelity and Guaranty Company, and alleges that appellant by the contract which it entered into with the Home Trust Company and the subsidiary "effected a merger and consolidation of the three named contracting corporations in accordance with and under the provisions of section 5379 of the Revised Statutes of Missouri 1929, Mo.St.Ann. § 5379, p. 7595, by the terms of which said contract the said Mercantile Home Bank and Trust Company purchased and acquired all of the assets of the said Home Trust Company and the said Home Safe Deposit Company, and assumed and became liable for all the liabilities of the said Home Trust Company and the said Home Safe Deposit Company."

Finding the issues in favor of the plaintiff, the court entered judgment against appellant for $17,473.21, and adjudged that the United States Fidelity & Guaranty Company was liable to the plaintiff in the amount of $14,000, that being the amount of the bond executed by it as surety, and provided that, if the plaintiff shall not be able to collect the judgment against the Home Trust Company, Home Safe Deposit Company and Mercantile Home Bank & Trust Company upon execution, then and then only shall execution issue against said United States Fidelity & Guaranty Company. The Home Safe Deposit Company paid the judgment against it so that the only judgment involved is that for the income tax deficiency of the Home Trust Company.

While it is alleged that appellant assumed all the liabilities of the Home Trust Company "by the terms of which said contract," that is not the contention urged by appellees here, nor was it in fact the theory upon which the lower court held appellant liable. Manifestly, "the terms of the contract" refute any such contention. The contract not only specifically enumerates what liabilities appellant assumed, but as clearly declares that no other obligations are or will be assumed. It is now claimed,

and the lower court found, that a merger or consolidation resulted, and hence appellant became liable for all debts of all the old corporations, notwithstanding the terms of the contract to the contrary, the court holding that such provisions are and were void.

The importance of the case becomes apparent when we consider the sweeping effect of the lower court's decision. If these provisions of the contract by which appellant disclaimed liability for the debts of these banks and trust companies, except such as were enumerated and specifically assumed, were void, then appellant not only became liable for the $18,000 taxes due the government, but for all the debts and liabilities of every kind and character of each of these corporations, amounting to many hundred thousand dollars, far in excess of the total capital stock and surplus of appellant. For instance, it appears in the contract that the Home Trust Company had outstanding obligations of certificates of indebtedness issued to three individuals amounting in the aggregate to $339,000, which the contract provided should under no circumstances and in no event be deemed to have been assumed by appellant; yet, if all these saving provisions of the contract are void, the appellant is at once liable for these debts, as well as the many other debts and liabilities of the various corporations which the contract specifically declared were not and should not be assumed. The result of such a holding, applied, as it must be, to all debts of these banks and trust companies, will be to wipe out the entire capital and surplus of appellant and take from it the ability to protect and pay the innocent and confiding depositing public which has extended its confidence and continued its deposits not only with appellant, but, we may assume, with many other institutions brought into life under similar circumstances and for equally beneficent purposes.

█ The law in Missouri, in harmony with the common-law rule, sustains the right of an insolvent debtor corporation, absent intent to defraud, to dispose of its assets for a fair and adequate consideration, so as to prefer favorite creditors, although the result may be to leave nothing for others who stand on a footing equally meritorious. Heidbreder v. Superior Ice, etc., Co., 184 Mo. 446, 83 S.W. 466; State v. Manhattan Rubber Co., 149 Mo. 181, 50 S.W. 321; Schufeldt v. Smith, 131 Mo. 280, 31 S.W. 1039, 29 L.R.A. 830, 52 Am.St.Rep. 628;

Alberger v. Nat. Bank of Commerce, 123 Mo. 313, 27 S.W. 657; Russe & Burgess v. Meisner Lumber & Mfg. Co., Mo.App., 243 S.W. 353; Graham Paper Co. v. Publishing Co., 172 Mo.App. 495, 158 S.W. 92; Warren v. Fertilizer & Junk Co., 145 Mo. App. 558, 122 S.W. 1087; Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478; Burston v. Fennewald, 222 Mo.App. 128, 2 S.W. 2d 824; Foster v. Mullanphy Planing-Mill Co., 92 Mo. 79, 4 S.W. 260; United States Rubber Co. v. American Oak Leather Co., 181 U.S. 434, 21 S.Ct. 670, 45 L.Ed. 938; Hollins v. Brierfield Coal, etc., Co., 150 U. S. 371, 14 S.Ct. 127, 37 L.Ed. 1113.

█ In the absence of any actual fraud, therefore, there was nothing unlawful about this contract. The undisputed facts clearly demonstrate that it was entered into in entire good faith, and there is no room for a suspicion of actual fraud. The consideration paid exceeded by some $50,000 or $70,000 the actual value of the property transferred. In passing, it may be observed that, if the sale and transfer had been fraudulent or without consideration, the debtor might in equity have set aside the transfer and subjected the assets to the payment of its claim, but here the assets had prior to the commencement of plaintiff's suit been entirely paid out by appellant in discharging lawful debts of its transferors, and, in addition, it has expended in the payment of such debts an amount in excess of $40,000, so that even in a court of equity the plaintiff could have recovered nothing. But it is urged that plaintiff is entitled to recover from appellant, in spite of the fact that it has paid full value for the property transferred, regardless of its good faith, regardless of the fact that the property transferred has been entirely devoted to the payment of bona fide debts of the transferor, and in disregard of all the equitable principles ordinarily determining the rights of the parties in such transactions, because, it is said, there resulted a merger or consolidation.

In considering this question, it is important to have in mind that the appellant paid a fair and adequate consideration for the property received, and that the transaction was not an unlawful one under the laws of Missouri, it not having been tainted by bad faith or actual fraud.

█ There is a recognized distinction as applied to corporations between the terms "merger" and "consolidation." In a merger, one corporation absorbs the other but re-

mains in existence, while the other is dissolved. In a consolidation, a new corporation is created, and the consolidating corporations are extinguished. In either event, the new corporation acquires all the assets, property rights, and franchises of the dissolved corporations, and their stockholders become its stockholders. Pinellas Ice & Cold Storage Co. v. Commissioner, 5 Cir., 57 F.2d 188; Royal Palm Soap Co. v. Seaboard Air Line Ry. Co., 5 Cir., 296 F. 448; Ferguson v. Meredith, 1 Wall. 25, 17 L.Ed. 604, 609; Collinsville Nat. Bank v. Esau, 74 Okl. 45, 176 P. 514; Atlantic, etc., R. Co. v. Georgia, 98 U.S. 359, 25 L.Ed. 185; Cortland Specialty Co. v. Commissioner, 2 Cir., 60 F.2d 937, 939; Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Drovers' & Mechanics' Nat. Bank v. First Nat. Bank, 4 Cir., 260 F. 9, 15.

Pinellas Ice, etc., Co. v. Commissioner, supra, went to the Supreme Court (287 U.S. 462, 53 S.Ct. 257, 260, 77 L.Ed. 428), where, in an opinion affirming the lower court it is, among other things, said: "But the mere purchase for money of the assets of one company by another is beyond the evident purpose of the provision, and has no real semblance to a merger or consolidation."

In Cortland Specialty Co. v. Commissioner, supra, the court was considering the statute with reference to reorganization, merger, or consolidation. In the course of the opinion it is said: "A sale of the assets of one corporation to another for cash without the retention of any interest by the seller in the purchaser is quite outside the objects of merger and consolidation statutes."

In Drovers' & Mechanics' Nat. Bank v. First Nat. Bank, supra, it was contended that a merger or consolidation had been effected. In the course of the opinion the court said: "In this instance there was no fraud in the purchase, every asset purchased and every debt assumed was particularly specified, the stock of the trust company was not purchased, no obligation was assumed to the stockholders of the selling corporation and the trust company continued its business for the purpose of winding up its affairs, including the payment of the note given to the First National Bank. The contract, therefore, was not a merger or consolidation and by it the First National Bank did not become liable for any debt of the trust company not mentioned in the contract."

The facts in that case bear a striking resemblance to those in the instant case.

It requires no argument to demonstrate that no merger resulted from the carrying out of this contract. A most casual inspection of the contract refutes any such thought. There were lacking, too, many of the essential elements of a consolidation. As has been observed, the stockholders of the Home Trust Company, with one exception, did not become stockholders of the new corporation. The old corporation was not dissolved but has continued to function as such. The contract contains provision for a return to the old companies of any excess resulting from the collection or sale of the property pledged, and it was thought at the time that these assets exceeded the obligations for which they were pledged as security. The old corporations have not been extinguished, and hence have not been consolidated with the new corporation. The contract was for an absolute sale and transfer of a part of the properties and assets of the old corporations and a transfer of the other assets as a pledge to secure a legitimate indebtedness. This is the construction which the parties to the contract have placed upon it throughout the period in which it has been in process of execution. The Home Trust Company did not become "practically extinct," but retained its franchise and continued to function as a corporation. The control and possession of the assets of the old companies which were vested in appellant by the contract were incident to carrying out the pledge. Appellant agreed not only to pay the Home Trust Company's depositors, but to liquidate the assets and apply them to its indebtedness of more than $2,000,000; practically without charge or expense to it. The parties thought the practical way to carry out such obligations was to create a bank and accept those who had been customers of the old corporations as customers of the new bank as far as possible.

In considering the provisions of the contract, the circumstances surrounding its execution must constantly be borne in mind. It was manifestly the purpose of those interested in these institutions to prevent a financial catastrophe, and the task was a delicate one. The psychology of the situation required that the relations of the depositors to the banking institutions be disturbed as little as possible, and for that reason the contract enabled appellant to deal directly with the old depositors. Cer-

tain of the officers from the old institutions were installed in the new bank, and the appellant was authorized to collect and liquidate the assets pledged by the old corporations, and it was intended to make it convenient and desirable for the customers of the old institutions to continue business with the new.

The contract contains provision that the old concerns would go into voluntary liquidation if so requested by appellant, and this is dwelt upon by appellees as indicating a consolidation. But the agreement to liquidate on request of appellant would enable appellant, in the event of a deficiency after the pledged assets had been disposed of and applied, more readily and promptly to enforce the stockholders' liabilities of the old concerns. It was a further safeguard, more or less conventional, favoring the creditor who held the pledge as security. It did not alter the controlling features of the contract, nor change its nature to assimilate the transaction under a merger or consolidation.

Appellees cite a number of authorities which they claim support the theory of merger or consolidation. It would unnecessarily extend this opinion to review these cases. It may be said of them generally, however, that they are cases in which the transfers involved were either without consideration, or for an inadequate consideration, or were tainted with actual fraud, and the courts held that the debtor, under well-recognized principles of equity, might pursue the assets in the hands of the transferee to the extent of the excess of the consideration paid for them by the transferee in satisfaction of the debt. Thus, in Blackington v. United States, 8 Cir., 6 F.2d 147, 148, this court held that the transferee had taken over all the assets of the taxpayer of the value of more than $14,000, and had left nothing in their place. "Such an absorption of assets," this court said, "carries with it necessarily a liability for the debts which those assets might have paid." The tax was much less than $14,000.

In Okmulgee Window Glass Co. v. Frink, 8 Cir., 260 F. 159, 162, this court held that the creditor of one corporation could maintain a suit in equity against a corporation which was "in its essence but a continuation of the activities and interests of the old company," but the recovery was limited to excess assets found to be held by the successor corporation as a trust fund.

There might be added the case of Hunn v. United States, 8 Cir., 60 F.2d 430, not cited by either party, in which this court held that there was a de facto dissolution of the transferor; that the transferees had received from the assets property of the value of $54,000, for which they had paid nothing, and we held the transferee liable to the extent of the value of the property received. This was also an equity suit.

Thompson v. Abbott, 61 Mo. 176, and Eans' Adm'r v. Exchange Bank, 79 Mo. 182, are also equity suits, and they held that transferees of property of an insolvent corporation without consideration became liable for the debts of the old corporation. That doctrine has no application to the facts here. The effect of the judgment here is to compel appellant to pay debts which it was agreed it should not assume. Here the creditor attempts to secure all the benefits of the transaction and of the new money put into the new corporation and secure payment of its entire debt out of appellant's money, and this in the absence of fraud and in the face of the undisputed evidence that the appellant not only paid adequate consideration but has already expended in paying the debts assumed over $40,000 in excess of what it received.

The Missouri cases cited are reviewed and considered by the Court of Appeals in Zimmerman v. W. L. Grush Produce & Commission Co., 156 Mo.App. 588, 137 S. W. 642, 643. The Zimmerman Case was an equity suit in which it was sought to follow property transferred in alleged fraud of creditors. In that case there was an absolute transfer of all the assets of an insolvent corporation to a new corporation bearing a name similar to that of the old one. But the court held that there was no merger or consolidation and no obligation upon the new corporation to pay an outstanding judgment debt of the old corporation which it had not assumed. The court cited the Missouri cases which are relied upon here by appellees and, among other things, it is there said: "The instances cited are not parallel to this one. The purpose of the new company was not to continue in existence the old company, but to put into existence a new corporation with new stockholders. * * * It lacked in the most important particulars the elements of a consolidation with the old company or a merger of the latter. * * * It being fully established that the transaction

amounted to nothing more than the purchase of the property of one corporation by another in good faith, we cannot see wherein appellant has any standing in equity. It is true the transaction amounts to giving a preference of one set of creditors over another. But it is legitimate for a corporation in failing circumstances to prefer one creditor to another in discharging its obligation, 'if the preference is made in good faith while the property remains in its possession unaffected by liens or by process of law.' Alberger v. National Bank, 123 Mo. 313, 27 S.W. 657; Schufeldt v. Smith, 131 Mo. [280] 286, 31 S.W. 1039, 29 L.R.A. 830, 52 Am.St.Rep. 628." See, also, Neely v. Rawlings, 5 Cir., 64 F.2d 655.

The lower court, in its opinion, cited the case of Caldwell State Bank v. First National Bank, 49 Idaho 110, 286 P. 360, as sustaining its conclusion. In that case the court held that from a fair interpretation of the contract between the parties the new bank was obligated to pay the small claim sued on, although it had not been specifically included in a statement of debts. True, the trial court had found that a merger resulted, but the Supreme Court expressly refrained from sustaining that finding. The authority we think inapplicable to the facts in this case. As has been observed, this is an action at law, but, even if it were a suit in equity, the equities cannot be said to be in appellees' favor. The contract vested the rights of a pledgee in appellant for the benefit of the depositors who have left millions of dollars with it, confidently relying upon its solvency which exists only if the contract be upheld as written. Such a doctrine would go far to ruin many financial institutions that have taken pledges.

The Missouri statutes concerning sale of assets and merger and consolidation of banks and trust companies are discussed in briefs of counsel. Where a merger of banks is effected under the statute, or probably regardless of statute, a creditor of either may recover a debt by suit against the resultant corporation. These statutory provisions add nothing to the general Missouri law. No provision gives rise to a right to sue except where a merger or consolidation has in fact resulted.

It was contended in appellees' briefs that the appellant was liable for the tax under the provisions of section 311(a) (1) of the Revenue Act of 1934, 26 U.S.C.A. § 311(a) (1), relating to claims against transferees. On oral argument, however, this contention was specifically withdrawn.

Convinced as we are that no merger or consolidation resulted from the carrying out of the contract, and the transaction being free from any taint of actual fraud, the sale and pledge of the assets being for an adequate consideration, and the appellant having already paid more than their value in discharge of legitimate debts of the old concerns, we conclude that the appellant was entitled to judgment dismissing the action, and hence the judgment appealed from is reversed.

STONE, Circuit Judge (dissenting).

These were Missouri corporations. What they did was within Missouri and governed by the state law. There is some difference between the parties as to whether the organization of appellant and the transfers to it were under section 5379, Mo.St.Ann. § 5379, p. 7595, or under article 4, section 5470 et seq., Mo.St.Ann. § 5470 et seq., p. 7666 et seq. (containing section 5488, Mo.St.Ann. § 5488, p. 7674) of chapter 34 of the Revised Statutes of Missouri 1929. Article 4 is not involved because the method pursued here was entirely different from and failed to follow essential provisions of that chapter.[1] Section 5379 of article 2 of the same chapter seems to be the only other statutory basis for what these companies did. It seems to fit what they did.[2]

[1] Article 4 covers "Merger and Consolidation of Trust Companies" and provides the methods and requirements therefor. Essential requirements under this Article are: submission to and approval by stockholders (sections 5477, 5478); exchange of stock of consolidation or merger company for that of consolidating or merging companies (section 5481); compensation of dissenting stockholders (sections 5482–5485); and merging of the "corporate existence" of the old companies into the new company (section 5486). Not one of these requirements was attempted to be met here.

[2] Section 5379 is as follows:

"*Bank may sell its business, or any of its departments—procedure.* Any bank may sell the whole of its business, or the whole of the business of any of its departments, to any other bank or trust company, state or national, or may for the purpose of consolidating or merging with another bank or trust company, state or national, transfer its affairs, as—

There is much argument here as to whether these transactions were sales, a merger or a consolidation. I am unable to see what difference that makes upon the liability of appellant for these taxes. Section 5379 expressly covers all three: Sales (of all or a part) of the business of a bank, a merger, or a consolidation. The power to do any one of these three things is conditioned "that such sale, merger, or consolidation shall in nowise impair, defeat or defraud any creditor of said bank or trust company or either of them."

It seems to me that this was a sale in form but a merger or a consolidation in effect—however, it makes no difference if it was just a sale. But it clearly was not a sale in which the appellant, as an independent entity, purchased the business and/or assets of the old companies and paid to each of them the fair value of what it got. Had that been the situation, all creditors of the old companies would have had to look to the purchase price paid the respective company for satisfaction of their debts.

What took place here and the effect thereof upon this tax debt of the Home were as follows: Creation of appellant sprang solely from the distressed situation of the four old companies and was for the purpose of meeting and salvaging that situation. The relationship between appellant and each of such companies was based upon a statement of liabilities and assets of each old company as of February 25, 1933.

Of these liabilities, appellant was to assume payment of deposits, outstanding cashier's and certified checks and certificates of deposit, compensation of officers and employees from February 1, 1933, and ordinary current bills incurred since February 1, 1933. The liabilities so assumed were to be regarded as a debt of the respective old company to appellant. Such liabilities of each old company were to be independent and separate from any responsibility by any other such company and the assets coming from each were to be devoted exclusively to satisfying its liabilities assumed by appellant. Appellant bought all cash, indebtedness of other banks to any old company, all furniture, records, etc., "and all other property used in the business of any Old Bank," and the capital stock and rental contracts of any safe deposit company of such old company. The aggregate amount of such money, etc., so acquired from each company was to be credited on the above assumed indebtedness of the respective company. There was a specific agreed valuation of the "banking premises" and equipment of the Home, because appellant planned to occupy such premises as its place of business. The difference between the above assumed indebtedness of each old company and the above assets taken over was "deemed the balance then owing on the debts of each Old Bank, shall be secured by all the remaining assets and property of each Old Bank of

sets and liabilities to the bank or trust company with which it intends to consolidate or merge: Provided, that such sale, merger, or consolidation shall in nowise impair, defeat or defraud any creditor of said bank or trust company or either of them. No state bank shall enter into such sale, purchase, merger, or consolidation as seller, except after obtaining the consent of the stockholders of record holding at least two-thirds of the outstanding capital stock, except where such sale, merger or consolidation shall, in the opinion of the commissioner of finance be deemed a public necessity or advantage. Such consent may be expressed either in writing, executed and acknowledged by said stockholders or by a vote at a stockholders' meeting called for that purpose, notice of which shall be given by mailing notice thereof to each stockholder of record at his last known address as shown by the records of said bank, at least twenty days prior to said meeting. Such notice shall state the time and place of holding of such meet-

ing and a brief and concise statement of the objects and purposes thereof. No such sale, purchase, merger or consolidation shall be made without the consent of the commissioner of finance. The commissioner of finance may before granting his consent thereto cause an examination to be made of each of the banks or trust companies involved, the expense of which shall be paid by said banks or trust companies and shall not exceed fifteen dollars per day for each examiner and the actual expense incurred while making the examination. The commissioner of finance shall, before granting his consent, require each of the banks or trust companies to file certified copies of all proceedings of their directors' and stockholders' meetings relating to the transaction, showing a full compliance with the requirements of this section, and also copies of any agreement or agreements which may have been entered into between said banks or trust companies." Laws 1927, p. 216, § 11.

every kind and character whatsoever, real, personal and mixed, including all assets and property heretofore charged off and not theretofore finally liquidated." · Such property of each old company was conveyed "by way of security for the amount of the debt of the respective" old company and such company was obligated, "when requested so to do" by appellant, to convey and deliver to it all or any of such property, to be applied upon the above balance of indebtedness of the respective company to appellant. As to any property theretofore pledged by any old company the equity therein was (with one exception) placed within the above provisions as to property conveyed as security to appellant. Appellant was to liquidate the properties conveyed to it (at the expense of the particular old company) and, when the credits from such property equalled the above balance of indebtedness of any old company, all re-

maining property coming from it to appellant was to be reconveyed by appellant. If such credits shall not equal such balance by February 25, 1938, then any remaining assets from the old company shall be sold at public sale and the proceeds applied thereto. "Each of the Old Banks agrees that it will cause such action to be taken as will result in its affairs being placed in voluntary liquidation if so requested by the New Bank, with all dispatch and as soon as may be legally done after receipt of such request." The legal expenses of organizing appellant and carrying out the contracts between it and the old companies were to be paid by appellant and allocated and charged to the old companies on the "proportion which their resources bear to the total resources of said four [old] banks."

The above is intended only as a bare outline of this arrangement.[3] The gist of the arrangement is that appellant was or-

---

[3] The complete contract is here set out in full except signatures.

### Contract.

"This agreement made and entered into this 25th day of February, 1933, by and between Sidney C. Walker, Nathan Rieger and Samuel Woodson, as Trustees for the New Bank hereinafter described, first parties, Home Trust Company, of Kansas City, Missouri, hereinafter designated as 'Home', second party, Mercantile Trust Company, of Kansas City, Missouri, hereinafter designated as 'Mercantile', third party, Sterling Bank, of Kansas City, Missouri, hereinafter designated as 'Sterling', fourth party, and Main Street Bank, of Kansas City, Missouri, hereinafter designated as 'Main Street', fifth party, witnesseth:

"Whereas, the Commissioner of Finance of the State of Missouri, from an examination of the second, third, fourth and fifth parties, has concluded that the capital of each of said parties, has been impaired or entirely destroyed, and that, with respect to each, a public necessity exists, and is of the opinion that it would be to the advantage of the stockholders and creditors of each of said parties that the assets of each be sold for the protection of the creditors and assets of each; and

· "Whereas, the board of directors of each of said parties, at meetings duly called, held and convened in accordance with their respective by-laws, because of the unprecedented withdrawal of deposits in each of said parties and because of the impairment of assets of each, have agreed with the Commissioner of

Finance of the existence of the public necessity and of an emergency in the affairs of each of said parties, as well as the advantage to each which would result from the sale of the assets of each to the New Bank; and execution and consummation of this contract the rights of the stockholders of each of the parties will be more advantageously liquidated and protected.

"Now therefore, in consideration of the premises and of the mutual obligations hereinafter referred to, and for other good and valuable consideration hereunto moving them, it is agreed by and between the · parties hereto as follows:

"1. The first parties agree to cause a new trust company (to be known as Mercantile Home Bank & Trust Co., or by some other appropriate name) to be organized under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri, having a cash capital of $200,000.00 and paid in surplus and undivided profits of Two Hundred Thousand Dollars ($200,000.-00), which shall be represented by capital stock divided into Two Thousand (2000) shares of the par value of One Hundred Dollars ($100.00) each. All of the capital stock, surplus and undivided profits of the New Bank will be paid in cash. The New Bank will be organized and a charter procured ready to do business on February 27, 1933. The board of directors of the New Bank shall consist of fifteen shareholders. The original officers of the New Bank shall include the following who shall receive such compensation as shall be designated

ganizcd to take over and did take over all of the property of each of the four banks under an assumption of certain liabilities of each. Such liabilities were confined to de-

by the board of directors of the New Bank:

"C. A. Brockhouse, Secretary.

"LeClair Lambert, Vice-President.

"Alexander Rieger, Chairman of the Board of Directors.

"Nathan Rieger, Vice-President.

"John Siemens, Vice-President.

"John W. Wagner, Chairman of the Executive Committee.

"Sidney C. Walker, Vice-President.

"Samuel M. Woodson, President.

"The by-laws of the New Bank shall provide for a Chairman of the Board of Directors and an Executive Committee consisting of five directors and the President. The following directors and President shall constitute the original Executive Committee:

"Jacob Barzen.

"LeClair Lambert.

"L. J. Navran.

"Nathan Rieger.

"Sidney C. Walker.

"John W. Wagner, Chairman.

"The stock of the New Bank shall be subscribed and paid for in cash at Two Hundred Dollars ($200.00) per share in the following manner:

"Nathan Rieger, 875 shares

"Samuel Woodson, 450 shares

"Mercantile Trust Company, 300 shares.

"Sidney C. Walker, on behalf of Main Street State Bank, 375 shares.

"The obligations hereunder of Messrs. Walker, Rieger and Woodson shall not be joint, but several.

"The first parties agree that the capital stock of the New Bank subscribed by Nathan Rieger and Samuel Woodson will be deposited with Nathan Rieger, Samuel Woodson and —— as Voting Trustees under a Voting Trust Agreement having a duration of five (5) years. The Voting Trust Agreement shall provide that all of the rights of stockholders and title to the stock shall be absolutely vested in the Trustees. Included in said Voting Trust Agreement shall be a provision that the Voting Trustees may increase the capital of the New Bank and sell the additional shares of the capital stock of the New Bank for such consideration as they may deem advisable, (but not less than par) and to such persons as they may select, it being the intention hereof that stockholders shall waive their preemptive rights to subscribe to any additional stock of the New Bank that may from time to time be authorized and/or issued. Certificate holders for Rieger stock shall select the successor of Nathan Rieger as Voting Trus-

tee. Certificate holders for Woodson stock shall select the successor of Samuel Woodson as Voting Trustee. The above Voting Trustees or successors shall select the successor third Voting Trustee in the event of a vacancy in that respect.

"In the event the third Voting Trustee as herein provided for is not named in this contract, then the two Voting Trustees as herein provided for shall select the third, but in the event they are unable to agree upon the selection of a third Voting Trustee ten (10) days before the next meeting of the stockholders of the New Bank, then the Executive Committee of the New Bank shall select such third Voting Trustee. The decision of the majority of the Voting Trustees shall be binding on all three Voting Trustees.

"2. The second, third, fourth and fifth parties each agrees to furnish to the first parties or the New Bank a duplicate statement of the true and correct condition of the respective party furnishing such statement, duly verified by the President of the party making such statement, showing the true and correct condition of such party as of the close of business on the 25th day of February, 1933. The statement shall show in detail the amounts of the resources and the exact liabilities of each party, in the same form substantially that reports are made by banks or trust companies in Missouri to the State Finance Commissioner, which statement shall become a part of this contract as if originally incorporated herein. There shall also be furnished a statement by each of the parties to the first parties, or the New Bank, of all of the assets and property of the party furnishing such statement which have heretofore been charged off the books of such party, and which is now in its possession or under its control, showing in detail the amount and character of such assets, which statement shall also become a part of this contract as if originally incorporated herein. The aforesaid statement of each bank shall constitute its covenant, warranty and representation with respect to its financial condition.

"3. The first parties agree to cause the New Bank to take over and to assume the payment of the following liabilities of the second, third, fourth and fifth parties, in the amounts respectively shown by the statements of each of said parties referred to in the preceding paragraph hereof, and as the same appear on the books of each of said par-

posits, special obligations (cashier's checks, certified checks and certificates of deposit), and current pay rolls and expenses from February 1, 1933, to February 25, 1933.

ties at the close of business on the 25th day of February, 1933, to-wit:

"(a) The amounts of all demand, time, savings and other deposits, with interest, if any, then accrued;

"(b) The amounts of all outstanding cashier's checks, certified checks and certificates of deposit, together with interest, if any, then accrued;

"(c) Such amounts as may at the close of business on said date be owing for services rendered by the active regular officers and employes of each of the last four named parties to this contract from not earlier that February 1, 1933, to the close of business on said date on the basis of the regular compensation which they had been receiving during the preceding calendar month as shown by the books of the last named four parties to this contract;

"(d) Ordinary current bills of each of said last named four parties incurred by each of them between February 1, 1933, and the close of business on said date.

"The aforesaid liabilities and obligations shall constitute the sole and only obligations of the last named four parties to this contract which the New Bank shall assume hereunder or in any manner become liable for. Each of said four banks will on February 25, 1933, be also indebted to the Reconstruction Finance Corporation, banks, bankers or trust companies for borrowed money together with accrued interest thereon as shown in the respective statements hereinbefore referred to. All of said indebtedness is secured, but is not to be assumed by the New Bank. The New Bank is hereby authorized in its discretion to pay all or any part of said obligations of said four parties to this contract and charge the amounts so paid to the account of the party which is now indebted therefor.

"4. The total amount of said obligations and liabilities so to be assumed by the New Bank on behalf of each of the four banks or trust companies who are parties to this contract, shall, on and after the close of business on the 25th day of February, 1933, represent a debt and obligation of each of the said banks to the New Bank, which said debt each bank, on behalf of itself and to the extent only of its debt, agrees to pay to the New Bank, together with the amount of any debt of any such bank owing to any bank, banker, trust company, or the Reconstruction Finance Corporation, which the New Bank may hereafter pay. Each of the four banks agrees to repay

its respective obligation or obligations to the New Bank on the 25th day of February, 1938, unless sooner paid as herein provided, with interest thereon until paid and on any balance remaining unpaid thereon from time to time at the rate of five per cent per annum. Said interest shall be computed on daily balances and charged to said account at intervals of ninety days.

"5. As of the close of business on the 25th day of February, 1933, an account shall be opened on the books of the New Bank for each of said four banks and in their respective names. On one side of each of said accounts there shall be entered as a charge against each of said banks all of the liabilities then assumed by the New Bank for such banks which are mentioned in paragraph 3 hereof; and as and when paid by the New Bank there shall also be entered in said account, as a charge against such bank for which the same may be made, all other liabilities to be assumed by the New Bank hereunder, or which may from time to time be paid by the New Bank on behalf of any such bank. From time to time there shall be added to said accounts as charges against any such Bank such amounts, if any, as shall be paid or advanced by the New Bank pursuant to the terms hereof. All such payments or advances shall be repaid to the New Bank at the same time and in the same manner as the other charges herein authorized to be made to the account of the respective banks. Interest on all such accounts shall accrue at the aforesaid rate from the date such charges are made so that the whole balance at any time owing on the accounts of any such bank shall bear interest at the said rate. No one of the presently existing banks shall be liable for any of the liabilities or obligations of any other such bank which may be a party to this contract, but the liabilities of each shall be treated independently and separately from the others.

"Second party has now and will concurrently herewith issue and have outstanding obligations or certificates of indebtedness issued pursuant to Section 5312 and following of the laws of the State of Missouri, 1929, to-wit:

| | |
|---|---|
| Alexander Rieger | $174,000.00 |
| Alexander Rieger | 26,000.00 |
| A. G. Biggerstaff, Trustee | 139,000.00 |

"The New Bank shall, under no circumstances, and in no event, be deemed to have assumed any of the obligations of

Obviously, the old companies continued only as shells stripped of all property and with no shadow of expectation of ever again functioning as business concerns.

any of the presently existing banks which are parties to this contract represented by certificates of indebtedness, nor shall the New Bank be deemed to have assumed any other obligations which are not specifically assumed by the New Bank under the terms of this contract.

"6. At the close of business on said 25th day of February, 1933, each of the Old Banks agrees to and does sell, transfer, convey, set over and deliver to the New Bank the following assets and property which shall thereupon become the sole and absolute property of the New Bank, to-wit:

"(a) All cash which any Old Bank then has on hand;

"(b) All amounts due to any Old Bank from any bank, banker or trust company, with interest payable therein, if any;

"(c) All furniture, fixtures, vaults, safe deposit boxes, machines, equipment, supplies, books, records and all other property used in the business of any Old Bank;

"(d) The capital stock of the safe deposit company, if any, of each of the Old Banks; and all outstanding rental contracts for safe deposit boxes, either with the safe deposit company of such Old Banks or with the Old Banks direct.

"The aggregate amount of the aforesaid cash and the amounts due and owing by banks, bankers and trust companies shall be credited to the respective accounts of the Old Banks and be applied as of the close of business on the 25th day of February, 1933, upon the aforesaid respective indebtedness of each Old Bank to the New Bank and to the extent thereof the indebtedness of each Old Bank shall be respectively reduced.

"The second party shall also be entitled to have its indebtedness to the New Bank as shown on the books of the New Bank as of the close of business on the 25th day of February, 1933, credited with the sum of Two Hundred Thirty-five Thousand ($235,000.00) Dollars, representing the agreed value of the banking premises, fixtures, equipment of the second party and the capital stock of the Home Safe Deposit Company. Each of the Old Banks shall also be entitled to credit for the amount of returned insurance premiums on policies of insurance of the various classes carried by each of the Old Banks and which shall be cancelled by the New Bank. Any such insurance which shall not be cancelled by the New Bank, but shall be retained by it, shall create a further credit for the Old Bank which originally paid for said policies to the extent of the unearned premiums thereon.

"7. The amount of the difference between the obligations and liabilities of each Old Bank so to be assumed, or which may be paid as aforesaid by the New Bank, and the aggregate amount of the property and assets so sold, transferred, conveyed and delivered to the New Bank as its sole and absolute property, deemed the balance then owing on the debts of each Old Bank, shall be secured by all the remaining assets and property of each Old Bank of every kind and character whatsoever, real, personal and mixed, including all assets and property heretofore charged off and not theretofore finally liquidated.

"For the purpose of so securing the debts and obligations of each Old Bank to the New Bank, each Old Bank agrees to sell, assign, transfer, convey, set over and deliver unto the New Bank, its successors and assigns, all of its assets and property of every kind and character and wheresoever situated including that heretofore charged off and not finally liquidated, excepting only the aforesaid assets and property so to be conveyed to the New Bank as its absolute property as aforesaid, and each Old Bank does hereby promise and agree that it will, when requested so to do from time to time, make, execute, and deliver to the New Bank such instruments of assignment, transfer, conveyance and endorsement as shall be legally sufficient and requisite to vest in the New Bank, its successors and assigns, the full and complete title in and to all said assets and property for the purposes of this agreement.

"It is the intent and purpose of this contract, anything herein contained to the contrary, notwithstanding, that the New Bank shall be entitled to receive all of the assets of each Old Bank hereby conveyed by way of security for the amount of the debt of the respective Old Banks hereby created, and such further advances as may be made hereunder for such Old Bank, with interest as herein provided, and that all proceeds received by the New Bank from the collection of such assets so pledged (both principal and interest) shall be credited to the respective Old Banks and applied by the New Bank to the reduction of the debt and interest owing by such respective Old Banks to the New Bank, applying the same, at the option of the New

That there were other liabilities (including the taxes here involved) of the Home which were left with no chance of payment is clear.

---

Bank, to the reduction of either principal or interest.

"8. Each of the Old Banks, on behalf of itself, shall designate one of its officers or directors as its representative and agent to act for and on behalf of the Old Bank appointing him in all matters which may require action by such Old Bank on its behalf or on behalf of its shareholders. Such agent shall have full power, right and authority to make and enter into any agreement with the New Bank which may become necessary or may be reasonably requested by the New Bank in order that such Old Bank may more effectually consummate and carry out the obligations of such Old Bank contained in this contract.

"9. Each Old Bank which is a depositary of any public funds agrees that such action will be taken upon its part as may be requested by the New Bank to secure the designation of the New Bank as the depositary of any public funds now held by such Old Bank, or of other funds, the deposit of which is secured in any manner, but nothing in this agreement shall entail upon the New Bank any liability under any agreement or contract between any Old Bank and depositors of funds as aforesaid, except to the extent of paying the amount of interest remaining unpaid thereon as of the close of business on the aforesaid date and to thereafter pay during the life of this agreement interest on said deposits at the rate named therein.

"10. The New Bank at all times, until it has been repaid the full amount of the indebtedness of each Old Bank with interest on such indebtedness as herein stated, shall have the right to become the sole and absolute owner of any of the property and assets of any Old Bank to be transferred and conveyed as security hereunder, or of any part of such asset or property by applying as a credit upon said indebtedness an amount representing the value or worth of such asset or property as hereinafter set forth, or the amount of the value or worth of the part of the same which is so purchased and acquired. No such purchase, however, shall have been deemed to have been made unless a record thereof appears in the minutes of the Board of Directors of the New Bank, or unless acquired under paragraph 6 hereunder. No asset of any one Old Bank may be used in satisfying the liabilities or indebtedness of any other Old Bank to the New Bank hereunder, but it is intended that the debt of the Old Banks shall be treated separately; that neither shall be liable for the obligations of the other.

"The term 'value' or 'worth' as used herein as to notes and interest bearing obligations which are now being carried on the books of any Old Bank at other than a nominal value of $1, shall mean the amount of principal and interest owing on any such note or interest bearing obligation according to the terms thereof. As to all other assets and property, other than those carried at a nominal value of $1, the value of worth thereof shall be the amount at which such asset or property was carried on the books of the respective Old Banks on the 25th day of February, 1933. As to all assets carried at a nominal value of $1, or as a part of assets carried at such nominal values, the value or worth thereof shall be such amount as the Executive Committee of the New Bank shall fix and determine. Notwithstanding the aforesaid provisions with reference to the value or worth of assets carried on the books of the respective Old Banks at a value other than a nominal value, if the Executive Committee of the New Bank determines that the value of such assets is less than the amount at which the same appears on the books of the respective Old Banks, any amount so fixed by the Executive Committee shall be deemed and considered for the purposes hereof as the value or worth of the same. If a part only of any asset is purchased hereunder, the New Bank shall be entitled to receive payment of the part so purchased before payment is made on the remainder of such asset, and any and all security for such asset shall be deemed to secure the part thereof so purchased prior to securing the remainder of such asset.

"11. As long as any amount remains owing by any Old Bank to the New Bank, the New Bank shall have the right to provisionally carry in its loans and discounts, or otherwise on its books, assets or property so to be conveyed by way of security as aforesaid and any part or parts of any of the same in an aggregate amount equal to the balance at any time owing by any Old Bank to the New Bank hereunder, and the New Bank shall have the right from time to time to make substitutions between assets and property so carried and the remaining assets and property. The act of the New Bank in so carrying assets and property and making substitutions therefor, shall in no manner affect the character thereof as security, or in any wise

The arrangement represented by these transactions presents a laudable attempt to meet a critical situation and, as such, is open to no condemnation. However, ap-

affect the right of the New Bank therein or create the New Bank as the owner thereof.

"12. The New Bank shall have full power, right and authority to renew or extend the time of payment and successively renew or extend, in whole or in part, any note or other asset to be transferred hereunder, and any and all such extensions and renewals may be evidenced by one or more notes or other evidence of the indebtedness involved. In renewing or extending the time of payment of any asset the New Bank may cause the same to be divided into such part or parts and in such manner as it may determine and may in its discretion rearrange any security for any asset or obtain additional security for the same in such manner that a part or parts of said asset will be secured by a prior and superior lien or liens to the lien or liens securing the remainder of such asset. It may further make substitution of security for any such asset or part thereof, change the rate of interest thereon or make such other changes in its terms as in its opinion is to the best interest of the parties thereto. The New Bank may release any endorser or guarantor of any obligation and accept other guarantors or securities therefor.

"Some of the assets of each Old Bank as of February 27, 1933, will be pledged to banks, bankers, trust companies, or the Reconstruction Finance Corporation, The New Bank may exercise all the rights, powers, privileges and immunities herein conferred upon it with respect to all such pledged assets of each Old Bank as it has with respect to unpledged assets under the terms of this contract, and no action taken with respect to such pledged assets shall be deemed either an assumption of the debt of any Old Bank, for which said assets are pledged, or as a purchase by the New Bank of such asset from the Old Bank.

"It is understood that the rights in this paragraph conferred on the New Bank are with the view of the New Bank becoming the purchaser of certain of the assets or parts thereof, which it may so renew or extend and its act in renewing or extending the time of payment of such assets or parts thereof, and obtaining additional security, or re-arranging the security therefor, or in doing any other act herein authorized, shall in no manner affect or prejudice its right to ultimately become the purchaser of such assets or any part thereof. Any and all renewals or extensions may be made either in the name of the Old Bank now holding the assets so extended or renewed or in the name of the New Bank, all at the option of the New Bank, but irrespective of the name in which the same or any part thereof may be so renewed or extended, the title of the New Bank shall in no manner be changed or affected thereby.

"With the consent of a majority of the members of the Executive Committee of the New Bank, the New Bank may compromise or settle any assets to be transferred hereunder, or discharge any party therefrom, or release any security therefor; any such consent of a majority of the Executive Committee may be obtained at a formal meeting of the Executive Committee or otherwise by written approval of a majority of the members of such Committee.

"13. The real estate of each of the Old Banks shall be transferred by each of such Old Banks to the New Bank, or to such person as may be designated by the New Bank, by general warranty deed, without reference therein to this agreement, or that any part of the same is to be held as security hereunder.

"All or any part of such real estate may be sold and conveyed by the New Bank for such consideration, upon such terms and to such person or persons as the Executive Committee of the New Bank may determine. Any conveyance of any of such real estate by the New Bank, pursuant to the terms hereof, or by its nominee, shall vest the full and absolute title thereto in the grantee or grantees thereof. The New Bank shall in no event be required to make any conveyance of any of said real estate with any warranties whatsoever, but shall make such conveyances only as will vest the title to the premises conveyed in the grantee or grantees thereof.

"The New Bank may make advances for the preservation or protection of any of the assets or property to be held as security hereunder, but shall not be required to do so. Any and all advances made by the New Bank for the preservation or protection of any asset of any Old Bank transferred hereunder shall be added to the debts of the Old Bank which now owns said asset and shall be secured and repaid with interest at the same rate and in a like manner as the remainder of the debts of said bank created hereunder.

"14. Until each Old Bank shall have repaid the New Bank the amount which may at any time be due and owing to the New Bank hereunder from such Old Bank, the New Bank shall have the right

pellees are here demanding their rights and I cannot escape the conclusion that this arrangement does "impair, defeat or [in a legal sense] defraud" appellees as credi-

to pledge and hypothecate for its own loans any of the assets of such Old Bank to be transferred hereunder to the New Bank, and the New Bank may also discount or re-discount any of the same, and no such act on the part of the New Bank shall be construed as a purchase by it of any such asset, but on the contrary, its title thereto shall in no way be affected thereby.

"15. Each Old Bank does hereby transfer, sell, assign, set over and deliver to the New Bank all pledges, guaranties, hypothecations and securities held by such Old Bank for the security of any asset or property hereby agreed to be conveyed, and each Old Bank does hereby agree that it will, from time to time, on request of the New Bank make such further and additional assignments, transfers and conveyances thereof as shall be sufficient and requisite to make all of the same as fully available to the New Bank as the same are now held by such Old Bank.

"16. The New Bank shall have the right to collect and enforce all assets in its own name and to exercise with reference thereto full rights of ownership in any suit or proceedings which it may be necessary to institute or become a party to for the collection thereof, or for the enforcement of any security pertaining thereto, but it may, if for any reason it so desires, conduct and carry on in the name of the Old Bank now owning such assets any suit or action on any of said assets for the enforcement thereof or of the security therefor. In addition, each Old Bank agrees that its agent appointed as aforesaid, will, on the request of the New Bank, take over and enforce any asset which the New Bank may determine should be so handled.

"17. The New Bank shall endeavor in good faith to collect and liquidate all of the assets and properties to be assigned, transferred and conveyed to it hereunder, without charge or expense, to any Old Bank, except expenses incurred by it other than in the usual and routine operation of its business, such as traveling expenses, attorneys' fees, court costs, and other actual and reasonable expenses of similar character, until the debt due and owing to it from each respective Old Bank, as created hereunder, shall have been fully paid. All amounts so expended by the New Bank in liquidation shall become a part of the debt of each Old Bank for whose asset such amount shall have been paid, and the same shall be secured and repaid, with interest at the same rate and in like manner as the remainder of said debt of such Old Bank.

"18. It is expressly understood and agreed that the New Bank shall in no manner become liable for the obligations or liabilities of any Old Bank to its stockholders, as such.

"Each Old Bank, on behalf of itself, and not the other, represents and warrants that it has good title to the assets and property hereby agreed to be sold, transferred and conveyed, and that there are no outstanding claims or liens against any of the same, except taxes on real estate, mortgage liens on its real estate as shown by its books, and obligations to banks, bankers, trust companies, the Reconstruction Finance Corporation and/or the obligations and Certificates of indebtedness mentioned in Paragraph 5, as shown on its books. Each Old Bank for itself hereby agrees to save the New Bank free and harmless from any liability or damage arising out of the assertion or establishment of any other lien or claim against its assets, that is, of such Old Bank.

"19. Each Old Bank represents that its books are correct in the details of its assets and liabilities. In the event any liability exists which does not appear on said books and the New Bank shall assume or pay the same, the amount of such liability shall thereupon become a part of the debt of the Old Bank for whom the same has been assumed or paid by the New Bank, and such Old Bank shall thereupon become further indebted to the New Bank, and such Old Bank agrees to repay said amount to the New Bank, with interest thereon, at the rate hereinbefore provided, and such additional debt shall be secured in like manner as is the other indebtedness of such Old Bank to the New Bank as herein provided. If any difference shall appear which shall decrease the amount of the assets to be transferred and conveyed hereunder by any Old Bank, and the New Bank shall suffer any loss on account thereof, then such Old Bank agrees to repay the amount of the same to the New Bank at the time herein named for the payment of its aforesaid debt, with interest thereon at the rate herein provided. Each Old Bank, for itself and not the other, represents that its assets are valid and genuine in all respects and it agrees to save the New Bank free and harmless from any loss or damage growing out of the invalidity or partial invalidity of or lack of genuineness of any such assets or the in-

tors of the Home and, therefore, is un-availing, under section 5379, to avoid liability for this tax. I think the judgment should be affirmed.

---

accuracy of the books of such Old Bank with respect to such assets or with respect to any liability. Anything herein to the contrary notwithstanding, it is understood that the statements of the third and fifth parties as of the close of business on February 25, 1933 may not reflect obligations to the Reconstruction Finance Corporation, respectively in the sum of $60,000.00 and $100,000.00, which will be consummated February 27, 1933. The New Bank does not assume these obligations, but its rights and powers with respect to the securities pledged therefor by said second and fifth parties shall be subject to the rights of the Reconstruction Finance Corporation.

"20. Whenever any Old Bank shall have received or shall be entitled to receive credit on its account equal to the indebtedness of such Old Banks to the New Bank, plus interest thereon, then the New Bank shall, subject to the provisions contained in Paragraph 21 hereof, transfer, assign, convey and deliver to the aforesaid agent of such Old Bank, without recourse or warranty of any kind or character, all assets then remaining in its possession as security, and the obligation of the New Bank and such Old Bank under this contract shall thereupon be at an end.

"21. The certificates of indebtedness of second party mentioned in paragraph 6 hereof in the sum of $139,000.00 have been secured by certain specific assets of the second party. If and when said certificates of indebtedness have been liquidated out of the proceeds from said assets, all remaining assets so pledged to secure said $139,000.00 shall be held by the New Bank as security for the indebtedness from time to time due and owing to the New Bank under this contract from the second party, which assets and the proceeds thereof shall be held, used and applied in the manner provided for the other assets of the second party. After the satisfaction of the indebtedness of the second party to the New Bank hereunder, then any such remaining assets of the second party held by the New Bank shall be delivered to the second party for the benefit of the holders of said other certificates of indebtedness or obligations of the second party, without any liability on the part of the New Bank to see to the application or distribution of the assets or the proceeds thereof.

"22. If, on or before the 25th day of February, 1938, after making all credits in the aforesaid account to which each Old Bank shall be entitled, the New Bank shall not have been fully paid the aforesaid debts of such Old Banks with interest as herein provided, then all assets of the Old Banks whose debt has not been paid as aforesaid, remaining as security for the payment of said debt, shall be sold by the New Bank at public vendue to the highest bidder at the South front door of the then Jackson County, Missouri, Court House at Kansas City, Missouri, for cash, first giving thirty days' notice of the time, terms and place of sale, with a brief general description only of the property to be sold. At such sale the New Bank may become the purchaser of all or any part of the assets so offered for sale. The proceeds derived from any such sale shall be applied upon the aforesaid debt and if there be any residue the same shall be paid to the then agent of the Old Bank for the satisfaction of whose debt to the New Bank such sale was held, subject, however, to the provisions with respect to the obligations of the second party contained in the preceding paragraph hereof.

"23. Each of the Old Banks agrees that it will cause such action to be taken as will result in its affairs being placed in voluntary liquidation if so requested by the New Bank, with all dispatch and as soon as may be legally done after receipt of such request. All such requests shall be made to the respective agents of such Old Banks. Each of the Old Banks agree that so far as legally possible, each will, upon the request of the New Bank, cause the New Bank to be substituted as a fiduciary in the place of such Old Bank, provided, however, the New Bank shall not, under any circumstances, assume any liability of any Old Bank incurred as such fiduciary prior to the substitution of the New Bank for such Old Bank. Each Old Bank also transfers, assigns, conveys and delivers to the New Bank any and all rights, titles and causes of action which it may now have against any person, firm or corporation, including any fees or compensation to which it may be entitled as any fiduciary, to be held by the New Bank in the same manner as the other assets of the Old Bank are to be held under the terms of this contract.

"24. Neither the Kansas City Clearing House Association nor any of its members or associate members, nor any of the members of various committees of said Association, nor any of its officers, are parties to this contract, nor did they have any participation in the nego-

tiations with respect thereto. Furthermore, no representations or agreements with respect to the New Bank or any Old Bank were made by any of the aforesaid parties. Such financial assistance, if any, as may have been given to any party to this contract was purely in the form of a loan without any conditions attached thereto and without any personal interest therein or in the consummation of this contract. Each of the parties hereto, including its directors as well as the directors of the New Bank have entered into this agreement of their own accord, voluntarily and without any counsel with respect thereto from said Clearing House Association, its members or any of the officers or employees thereof.

"25. The fourth party does hereby further covenant and agree with the New Bank that any and all rights and claims which it may now or hereafter have against the predecessor of the fourth party are hereby transferred, conveyed and delivered to the New Bank in the same manner and for the same purposes as the other assets of the fourth party are transferred, conveyed and delivered hereunder.

"26. The New Bank shall pay Messrs. Ryland, Stinson, Mag & Thomson for their legal services rendered by them in connection with the organization of the New Bank and the preparation and carrying out of this contract. The amount so paid shall be allocated between the four Old Banks and charged against them in the proportion which their resources bear to the total resources of said four banks, and shall be deemed as an additional obligation or debt of each of said four banks to the New Bank in the proportion hereinbefore set out.

"In witness whereof, all of the parties hereto have executed or caused to be executed, this contract by duly authorized officers, each for himself or itself, without liability for the other, this 25th day of February, 1933."