Meyer ACKERMAN et al., Respondents,

v.

GLOBE–DEMOCRAT PUBLISHING COMPANY, a Corporation, Appellant.

No. 49308.

Supreme Court of Missouri,

Division No. 1.

April 8, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied June 4, 1963.

Hocker, Goodwin & MacGreevy, Lon Hocker, St. Louis, for appellant.

Bartley & Bartley, Malcolm L. Bartley, Donald S. Siegel, St. Louis, for respondents.

HOUSER, Commissioner.

This is an action by 154 members of St. Louis Typographical Union No. 8 against Globe-Democrat Publishing Company, a corporation, which is engaged in the business of publishing a daily newspaper in St. Louis known as the "St. Louis Globe-Democrat," for severance pay under a collective bargaining contract. A jury in the Circuit Court of the City of St. Louis returned a verdict for plaintiffs for $234,-707.80 plus interest. Judgment was rendered accordingly. Defendant appealed.

The union, an unincorporated labor organization, was the designated and recognized sole bargaining agent of all Globe-Democrat employees engaged in composing room work. The union and the corporate publisher will be referred to as "Union" and "Globe-Democrat."

On June 17, 1958 Union and St. Louis Newspaper Publishers' Association (consisting of the two corporations which publish the St. Louis Post-Dispatch and the St. Louis Globe-Democrat) entered into a written collective bargaining agreement for the period January 1, 1958 to December 31, 1959, providing the hours, wages and other terms and conditions of employment of plaintiffs by Globe-Democrat.

We have italicized the portion of the article of the agreement which forms the contractual basis of this action:

"ARTICLE XI

Severance Pay

"1. Situation holders laid off to reduce the force shall receive severance pay of one week's pay for each year of continuous priority.

"2. *In the event of merger, consolidation or permanent suspension of publication by any newspaper covered by this contract, all employes who lose employment thereby shall receive severance pay* as follows:

"Employes having six months priority standing, six (6) weeks' pay.

"Employes having one year or more priority standing, twelve (12) weeks' pay.

"3. Such severance pay shall be at the employe's regular straight time rate of pay. Priority standing shall be as recorded on the books of chapel officers at the time of such lay off, suspension, merger or consolidation."

On February 21, 1959 the St. Louis Newspaper Guild, a union not affiliated with the typographical union, struck against Globe-Democrat and established a picket line. Plaintiffs, typographical union members, who had been working at Globe-Democrat on various shifts, and all other mechanical craft employees, refused to cross the Guild picket line. By a provision of the contract each of these plaintiffs had a right to refuse to cross the picket line without being disciplined therefor, but without payment for time lost. The publisher of the Globe-Democrat that day sent a letter to all employees saying "I regret very much that the Globe-Democrat will not be able to publish its Sunday edition because of a strike by the St. Louis Newspaper Guild. It does not appear probable that publication will be resumed in the immediate future."

472

About 3 o'clock a. m. on February 22 the Globe-Democrat delivered a letter to the Union president saying: "Any employee member of your union who presented himself for duty at his accustomed place of work in the Globe-Democrat building composing room today or does so Sunday, February 22, 1959, will be put to work and paid his regular day's pay at the straight time rate. This condition also applies to regular situation holders who are members of your union, who continue to report for duty at the Globe-Democrat building at their accustomed place of work on their regular work days and hours until the work stoppage caused by the St. Louis Newspaper Guild is ended or until further notice." On February 27, 1959 Globe-Democrat sold its building, printing plant, machinery, equipment and other personal property to Pulitzer Publishing Company, publishers of the St. Louis Post-Dispatch, under an agreement by which Pulitzer agreed to print the Globe-Democrat for ten years from February 27, 1959, beginning the date the Globe-Democrat was prepared to resume publication following settlement of the then-existing strike of its Guild employees. This agreement provided, among other things, that "both parties are desirous of retaining their separate identities and their separate news, advertising, circulation and editorial policies" so as to present to the public more than one coverage and opinion of public affairs by two independent newspapers. Pulitzer agreed to pay all printing expenses from the point where the copy was received to delivery of the printed newspapers at the truck side of the loading dock, where Globe-Democrat would accept and be responsible for their delivery. Globe-Democrat was to maintain in its own separate quarters its own business, advertising, circulation, news and editorial departments and pay all expenses up to delivery of the material for printing and all expenses of delivery of newspapers from the loading dock. Globe-Democrat was to be responsible for all wages or other obligations incurred prior to date Pulitzer began printing the Globe-Democrat and Pulitzer

was to be liable only for wages, etc. incurred in the *printing* of the Globe-Democrat after said date. Pulitzer agreed to employ any additional persons it might need to print the Globe-Democrat "from the present employees of Globe-Democrat Publishing Company if available, but shall not be obligated to employ any of the [said employees] whose services are not actually needed by it."

On the same day the publisher of Globe-Democrat sent a letter to all its employees, saying in part:

"To effect greater economy and efficiency in mechanical operation, The Globe-Democrat today entered into an agreement with the St. Louis Post-Dispatch under which the Globe-Democrat will be printed by the Post-Dispatch, when and if the Guild strike is settled.

"The sale is of the physical property only. The editorial, advertising, circulation and business departments of the two newspapers will be entirely separate. The Globe-Democrat will continue as a completely independent newspaper in every sense of the word.

"The consolidation of mechanical operations between competing newspapers finds great precedent in many cities throughout America, a list which we suspect may grow larger in the future as the mechanical costs of publishing a daily newspaper continue to rise. The editorial, advertising, circulation and business independence of these newspapers has not in any way been affected. I assure you that it will not be affected in St. Louis.

\* \* \* \* \* \*

"Members of the mechanical unions will be employed on a priority basis in the consolidated mechanical operation. If they all cannot be employed, the dismissal provisions of the current mechanical contracts will apply."

None of plaintiffs performed any work for, received any compensation from, or were called back to work by Globe-Democrat after February 27, 1959. All plaintiffs

were on the last priority (seniority) list made up in February, 1959, which showed when each member of Union became an employee of Globe-Democrat. Union had another group of members (called a "chapel") in the composing room of the Post-Dispatch. None of plaintiffs' names appeared on the priority list at the Post-Dispatch chapel as of February 27, 1959. A member of Local 8 in the employment of the Globe-Democrat could not have priority with more than one newspaper at the same time, and if an employee lost priority standing at Globe-Democrat and took a job at some other newspaper his priority would begin as of the date of his employment by the second employer and his priority prior to February 27, 1959 was lost. Those plaintiffs hired by Post-Dispatch after February 27, 1959 were given situations in their priority at the bottom of the Post-Dispatch priority list. The president of Union testified that at a meeting on February 27, 1959 called by the publisher of Globe-Democrat, attended by representatives of the mechanical craft unions, the publisher announced the sale of Globe-Democrat's printing equipment to Pulitzer and that Globe-Democrat would no longer need the services of the members of the various mechanical unions, and that Post-Dispatch would hire what they needed of the former Globe-Democrat employees "and those who were not employed by the Post-Dispatch would receive severance pay."

Certain alleged admissions by Globe-Democrat, by way of pleading in the several lawsuits involving the various mechanical crafts unions, were read in evidence. By these pleadings Globe-Democrat admitted that it gave notice that there had been a *merger of mechanical operations* of the two newspapers; that it gave notice that *the mechanical operations of the two companies were consolidated and merged* and operated solely and exclusively by and under control of Pulitzer; that there had been a *discontinuance of mechanical operations* by Globe-Democrat. In its answer in Irwin v. Globe-Democrat Publishing Company, Mo., 368 S.W.2d 452 before this Court, Globe-Democrat construed the arrangement between Globe-Democrat and Pulitzer *as a merger or a consolidation of the mechanical functions of the two publishers.* Globe-Democrat also admitted in a pleading that the Globe-Democrat gave notice to plaintiffs and their union representatives of the *discharge of plaintiffs* and the *suspension of the printing* of the newspaper by Globe-Democrat. Since February 27, 1959 Globe-Democrat has not owned the building where, or the equipment on which, plaintiffs performed their accustomed work, and has had no contractual right to use presses, printing equipment and auxiliary facilities with which Globe-Democrat newspapers could have been printed. As a consequence of the strike Post-Dispatch had need for additional help in its mechanical department. Some of the plaintiffs were sent by Union to Post-Dispatch to do this additional work. Some were sent to other places of employment. At Post-Dispatch these former employees of Globe-Democrat did not immediately get "situations" under union law that if an employee occupies a position for five successive nights and days in an employment he is entitled to a situation, because Union "froze" the priority board at Post-Dispatch until after the end of the Guild strike at Globe-Democrat (May 27, 1959). The freeze officially went off at approximately the time the Post-Dispatch started printing the Globe-Democrat, June 1, 1959. On June 2, 1959 Post-Dispatch made a statement of policy with reference to new employees formerly employed by Globe-Democrat, to the effect that they would be "new" employees of Pulitzer; that Pulitzer was under no obligation to employ any particular person or any number of persons formerly employed by Globe-Democrat, but had agreed to select such new employees as it might need from qualified former employees of Globe-Democrat, if available, stressing that Pulitzer had no connection with Globe-Democrat except its agreement to print Globe-Democrat on a contract basis in Pulitzer's plant. The notice also stated that in the event a former

employee of Globe-Democrat should become eligible to dismissal or severance pay after employment as a new employee of Post-Dispatch only actual service in employ of Post-Dispatch should be taken into consideration in computing the amount of such severance pay. Globe-Democrat continued to pay the employer's contribution for plaintiffs' Blue Cross-Blue Shield coverages after February 27, 1959, and as long as June 1, 1959. The court refused an offer by Globe-Democrat to prove that among the persons engaged in the printing trade and printing business in the St. Louis area the word "printing" means the mechanical reproducing of type on paper, and the word "publication" means the making public of printed matters. Plaintiffs introduced no evidence that in the trade "publication" is understood as the equivalent of "printing," or that Globe-Democrat Publishing Company as a corporation had been involved in any merger or consolidation. It was established that there was no change in the corporate status of the Globe-Democrat Publishing Company, a corporation, since its incorporation in 1873, and that neither Globe-Democrat nor Pulitzer acquired any interest in the other's corporation. Post-Dispatch has been printing the Globe-Democrat under its agreement, since June 1, 1959, with the exception of 14 days in June, 1959 when publication was interrupted by a strike at Post-Dispatch.

Plaintiffs' petition sought severance pay under Article XI, paragraph 2 of the collective bargaining agreement, supra, on the basis of allegations that the *mechanical operations of the two papers were consolidated* and operated exclusively by Post-Dispatch, and that there was a merger, consolidation or permanent suspension of the *printing* of the Globe-Democrat by defendant, but plaintiffs' main instruction directed a verdict on the basis of a finding that there was a *"merger, consolidation or permanent suspension of publication by defendant* as set out in Article II, paragraph 2 of the aforesaid collective bargaining agreement," and that "plaintiffs, or any of them, lost employment thereby with defendant, * * *."

The court defined the term "lose employment thereby" occurring in Article XI, paragraph 2, as "loss of employment with any newspaper in the event of a merger, consolidation or permanent suspension of publication" and instructed the jury to disregard whether plaintiffs worked for other employers after loss of employment with Globe-Democrat.

The court refused defendant's motion for a directed verdict; and refused Instructions B and C, withdrawing consideration of whether there was a permanent suspension of publication and whether there was a merger or consolidation, and Instruction D defining "merger," "consolidation" and "publication," all offered by defendant.

On this appeal defendant makes 10 points, six of which relate to the phrase "merger, consolidation or permanent suspension of publication"; four of which involve the phrase "who lose employment thereby."

The first point is that the court erred in refusing defendant's motion for a directed verdict because there was no evidence to support the necessary finding of either a "merger, consolidation or permanent suspension of publication" within the meaning of paragraph 2, Article XI, supra.

Globe-Democrat's position is that "merger" and "consolidation" are words of art having a specific meaning in the law of corporate reorganization, and that they were so used here; that the words "merger, consolidation * * *," modified by the adverbial phrase "by any newspaper," refer to merger or consolidation of the corporate entity Globe-Democrat Publishing Company, and to the assimilation of two or more corporate entities into one; that under the collective bargaining agreement employees are entitled to severance pay if they lose employment by reason of a corporate merger or consolidation, but these terms were not intended to cover loss of employment due to merger or consolidation

of a department or a composing room, or suspension of the printing function upon sale of its physical plant and printing equipment, by a corporation which continues in business.

Globe-Democrat cites § 351.450, V.A.M. S., under which the several corporations involved in a statutory merger or consolidation become a single corporation known as "the surviving corporation" in cases of merger, and "the new corporation" in cases of consolidation; the separate existence of all corporations in a plan of merger or consolidation ceases, except for the surviving or new corporation, which thereafter possesses all of the rights, etc. of the merging or consolidating corporations, and all property, debts, etc. of them are taken to be transferred to the single corporation, along with the liabilities and obligations of the corporations so merged or consolidated. Appellant says Globe-Democrat Publishing Company and Pulitzer Publishing Company, each of which survived and preserved its own separate corporate existence and identity, did not merge or consolidate into a "surviving or new corporation."

Globe-Democrat contends that the words "merger" and "consolidation" express ideas which, although nearly the same, are distinct enough to require that both words be used when both types of corporate reorganization are intended to be encompassed; that if merely unification of function had been intended, either word would have expressed the whole of the idea and there would have no need of both; that the use and juxtaposition of these two words, in the contract, echoing their use and juxtaposition in the statutes,[1] indicates that the parties had in mind the type of merger or consolidation to which the statutes refer.

Globe-Democrat further contends that even if the words are to be construed with an imprecise and general meaning, it is nevertheless plain that the parties did not intend that the clause operate in the event of any type of partial or functional unification. It points to the modifying phrase "by any newspaper covered by this contract," contending this refers to Globe-Democrat Publishing Company, a corporation, and that it is the publishers and the conduct of the business of the corporate publishers, not the publications, that are "covered by this contract."

Globe-Democrat also relies upon the dictionary definition of "consolidation" ("to bring together and unite firmly into one mass or body") and "merger" ("to sink or disappear into something else; be swallowed up; lose identity or individuality: with in.")

Globe-Democrat says the only fact or evidence pleaded, proved or submitted to the jury upon which to predicate the conclusion of merger or consolidation was the sale of the plant and equipment and the execution of the printing contract, neither of which indicates that Globe-Democrat was united with or swallowed up by Pulitzer, and that this is true whether the word "newspaper" be construed to mean the publisher or the publication. It maintains that the contract between the publishers carefully preserves the separate identity and mutual independence of the two corporations, and is a simple printing contract; that there is no evidence of any uniting or swallowing up by either of them or that the absolute separation preserved by the contract has not been scrupulously observed in fact; that no merger or consolidation was shown by the evidence.

Union's position is that "merger" and "consolidation" was intended to include any sort of uniting or combining of the printing function as a result of which employees lose their employment. They refer to paragraph I of the Preamble to the collective bargaining agreement, which provides: "All wages, vacation credits, retirement pay credits and severance pay credits shall be considered as an earned equity and shall

[1] In addition to § 351.450 we are referred to §§ 355.195, 352.140, 394.210 and 394.220, and § 363.770 et seq.

have prior claim in the event of merger, permanent suspension or liquidation. The cash equivalent of any such earned equity shall be paid immediately upon any employe's severance of employment as a result of such merger, permanent suspension or liquidation," and to Section 13, Article III, General Laws of the Union, which provides: "Subordinate unions shall incorporate in proposed contracts a clause providing for * * * severance pay of not less than two weeks pay for each year of priority in the office for all journeymen affected by suspension or mergers * * *." The failure in these quotations to use the words "merger" and "consolidation" in juxtaposition; the use only of the word "merger" and the use of the words "permanent suspension" instead of "permanent suspension of publication" indicate that the parties intended the words "merger" and "consolidation" to mean any combining or uniting of the printing function which results in a loss of employment, so says the Union. Union proposes that the following language appearing in Section 23, Article I, General Laws of the Union, reveals that Article XI of the collective bargaining agreement is speaking of mergers or consolidations of *printing offices:* "In filling of apprenticeship vacancies preference shall be given to apprentice members discharged from the military services * * * whose terms of apprenticeship have been interrupted because of suspensions, mergers or consolidation of printing offices, * * *."

Union argues that the words in question are common, ordinary words in every day use, and do not have the definite legal meaning for which appellant contends; that while they might at first have such a connotation to one trained in the law, they do not convey such a meaning to the ordinary composing room employee or a member of a union negotiating committee, to whom these words mean a unification or combining of the function of printing.

Union maintains that the parties did not mean "merger" or "consolidation" in the sense of a corporate merger or corporate consolidation; that there is no evidence to support such a construction but there is evidence that the publisher of Globe-Democrat considered that what happened constituted a merger, consolidation or permanent suspension of publication within the meaning of the contract, as shown by his oral statement and letter of February 27, 1959 indicating that those mechanical employees who did not obtain employment with Pulitzer would receive severance pay, and his references to "consolidation of mechanical operations." Reference is made to allegations in various pleadings filed by Globe-Democrat in the five lawsuits filed in connection with the claims of the several unions, in which Globe-Democrat admitted that "the mechanical operations" of the two newspapers "were consolidated and merged" under the operation and control of Post-Dispatch, and that Globe-Democrat "and the merger, consolidation or permanent suspension of the printing" of the Globe-Democrat; admitted that Globe-Democrat gave notice to plaintiffs of a sale to Pulitzer of the building, printing presses, equipment, and physical properties of Globe-Democrat "so that the mechanical operations of the [Globe-Democrat] and [Pulitzer] could and would be consolidated and operated solely and exclusively by and under the control of [Pulitzer]"; admitted that Globe-Democrat discontinued mechanical operations; and alleged that "the arrangement between defendant and [Pulitzer] was within the meaning of Article XII, Section 1 (the same as instant Article XI, Paragraph 2) a merger or consolidation of the mechanical functions of the two publishers, * * *."

Union also urges that the court should have ruled as a matter of law that there was a merger, consolidation or permanent suspension of employment, and a loss of employment thereby. It says this was an agreement to provide severance payments to employees of Globe-Democrat "in the event that such employees lost their employment through no fault or misconduct on their part"; that it covered the performance of composing room work; that if composing

room operations were terminated employment would be terminated and it was for such a loss of employment that Article XI was intended to provide severance pay; that it would be of no concern whether appellant was able to put out a newspaper by some other means or in some plant other than its own; that it is "inconceivable" that the parties would make payment of severance benefits depend upon Globe-Democrat's ability to continue publishing by whatever means it could, regardless of whether plaintiffs were still employed to perform composing room work.

■ In determining whether plaintiffs adduced evidence of merger, consolidation or permanent suspension of publication within the meaning of the agreement, and in construing the agreement to determine what the parties intended by the provision in question, we look at the relationship of the parties, the subject matter of the contract as a whole, the surrounding facts and circumstances to the extent that they are shown and bear upon the matter, and any practical construction the parties themselves may have placed upon the agreement by their acts and conduct. Leggett v. Missouri State Life Ins. Co., Mo.Sup., 342 S.W.2d 833, 852.

■ Thus considered, we conclude that the loss of employment referred to in paragraph 2, Article XI was loss of employment resulting from Globe-Democrat Publishing Company, a corporation, GOING OUT OF BUSINESS AS THE PUBLISHER OF A NEWSPAPER, either by corporate merger or consolidation, or by permanently suspending publication for any reason.

This seems evident not only from the specific language used in said paragraph 2, but also by considering the wording "merger, permanent suspension or *liquidation*" (our emphasis of language indicative of the winding up of a corporation (occurring in paragraph (I) of the Preamble.

■ By differentiating between the two concepts "merger" and "consolidation" the parties evidently meant to ascribe to the two words different meanings. In Dodier Realty & Investment Co. v. St. Louis National Baseball Club, 361 Mo. 981, 238 S.W. 2d 321, 324, this Court, sitting en banc, pointed out that the two words are not the same; that a consolidation exists where a new corporation comes into existence to assume the liabilities of the former corporations and the former corporations are dissolved and cease to exist, while a merger, which means something more than a mere consolidation, exists where one corporation is continued and the others are merged in it without the formation of a new corporation. And see § 351.450, V.A.M.S. The words were used in connection with "any newspaper covered by this contract," which means in this instance Globe-Democrat Publishing Company, a corporation. When words with a well-defined meaning are used in a contract referring to a corporation it is reasonable to assume that they are used by the contracting parties in the sense ordinarily ascribed to them in the field of corporate law.

■ Stated in the language of corporate reorganization, there has been no merger or consolidation resulting in the formation of a surviving or new corporation and no dissolution of Globe-Democrat Publishing Company, a corporation. The stockholders of Globe-Democrat did not become stockholders of Pulitzer, or vice versa. The corporations have not been extinguished and have not been consolidated. The contract was for an absolute sale and transfer of the properties to Pulitzer, and for printing. Globe-Democrat did not become extinct, either as a corporation or as a publication. It retained its franchise and continued to function as a corporation. Its corporate identity has continued without interruption since 1873.

■ The mere purchase by one corporation of a part of the assets of another for a sufficient consideration (and there is no suggestion that the consideration was inadequate or that the sale was not in good

faith) is not a merger or a consolidation. Mercantile Home Bank & Trust Co. v. United States, 8 Cir., 96 F.2d 655; Pinellas Ice & Cold Storage Co. v. Commissioner of Internal Revenue, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; Drovers' & Merchanics' Nat. Bank of Baltimore, Md. v. First Nat. Bank, 4 Cir., 260 F. 9; Pankey v. Hot Springs Nat. Bank, 46 N.M. 10, 119 P.2d 636, 640.

Whether we define these terms by resort to legal sources, everyday dictionaries or common understanding, the words "merger" or "consolidation" by Globe-Democrat describe situations not presented by the facts in this case. There simply has been no combining, uniting, swallowing up, absorption, springing into existence of a new corporation or dissolution of an existing corporation, involving Gobe-Democrat Publishing Company, by which its identity as a newspaper and as a corporation has been extinguished.

■ Union's proposition that the language employed was intended to encompass "any sort of uniting or combining of the printing function" finds no support in the wording of paragraph 2, in any other provision of the agreement, or in the evidence. The agreement makes no reference whatever to the uniting or combining of the printing function, the composing room, the chapel, the Machine Department, the Machine Tenders' Department, the Proofroom Department, the Adroom Department, the Makeup Department, or any other unit or fragmentation of "the newspaper covered by this contract." Instead the contract refers to "merger" or "consolidation" *by any newspaper covered by this contract,* which in this case means "by Globe-Democrat Publishing Company, a corporation."

■ Plaintiffs also failed to prove that there was a "permanent suspension of publication." This phrase cannot be twisted and strained to mean permanent suspension of "printing," under any fair interpretation of the word "publication," whether we use

technical legal definitions or everyday acceptance of the words. "Publication" is not synonymous with "printing" in this situation. In the context in which it is employed, "publication" means the business of causing a newspaper to be composed, edited, printed and disseminated or distributed to the public, and the fact that the Globe-Democrat terminated the practice of causing its newspaper to be printed by its own employees in its own building or plant did not result in a "permanent suspension of publication." Allen v. Globe-Democrat Publishing Company, Mo.Sup., 368 S.W.2d 460. The facts show a temporary suspension of publication, caused by the strike, but no permanent suspension of publication. The Globe-Democrat resumed publication June 1, 1959.

■ We find no practical construction, either in the pleadings filed or in its letter or oral announcement on February 27, that constitutes a binding admission against interest by Globe-Democrat that there was a merger, consolidation or permanent suspension of publication by Globe-Democrat. The most that can be said is that Globe-Democrat construed the contract of sale and for printing as a *merger or consolidation of the mechanical operations* of the two newspapers. A consolidation of one particular function such as mechanical operations, out of the manifold operations involved in the conduct of a newspaper business, is not a consolidation of the business, or of the corporation. An admission that the mechanical operations of two newspapers have been consolidated by a sale and printing contract is not an admission that there has been a consolidation of the two corporate entities.

Union's references to various provisions of the General Laws of the International Typographical Union in support of their construction have little if any bearing upon the question, because the General Laws were not incorporated in or made a part of the terms of the collective bargaining agreement, except as provided in Articles II, 5

and VI, 1, both of which are immaterial here. Inconsistently, counsel for Union took the position below that the General Laws were not a part of the contract and were not binding upon Globe-Democrat.

We realize that this collective bargaining agreement was a comprehensive labor contract the object and purpose of which, from the standpoint of the bargaining representatives of Union, was to protect the interests of the members of Local 8 in every conceivable aspect of their employment, including severance pay, as fully as possible. Doubtless their objective was to provide for all contemplated circumstances in which the question of the right to severance pay might arise. The language finally agreed upon to accomplish this objective, however, was not sufficiently comprehensive to cover all situations and circumstances in which the employer-employee relationship between the members of Local 8 and Globe-Democrat might be terminated. Instead of providing for severance pay upon termination of the relationship for any reason not connected with willful breach of duty or willful misconduct (as was done in the Guild contract in Globe-Democrat Publishing Co. v. Industrial Commission, Mo.App., 301 S.W. 2d 846, 848), the agreement before us provides severance benefits in *three particular eventualities only*, thereby excluding all others. The parties simply failed to provide for, and the agreement does not contemplate, the situation that actually came to pass, i. e., loss of employment with Globe-Democrat resulting from the sale of the physical plant and equipment by which Globe-Democrat had been printing its newspaper, and the negotiation of a contract with an outside firm for the physical printing of the newspaper.

Plaintiffs' rights under this agreement depend entirely upon contractual provisions. We are not at liberty to write into the contract a provision covering loss of employment by consolidation of *mechanical operations* or permanent suspension of *printing*. We cannot decide the case on the basis of what the parties may have intended to say. Our function is to determine what the parties intended by *what they did say*. Chater v. Carter, 238 U.S. 572, 584, 35 S.Ct. 859, 863, 59 L.Ed. 1462.

There is no evidence in this record that there was any merger, consolidation or permanent suspension of publication, within the meaning of paragraph 2, Article XI, and appellant's motion for a directed verdict at the close of the evidence, based upon failure of proof, should have been sustained.

The judgment is reversed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.

On Motion for Rehearing or to
Transfer to Court En Banc.

PER CURIAM.

Respondents have filed a motion for rehearing or to transfer to the court en banc. Transfer is requested on the contention that this case involves a federal question requiring the transfer of the case to the court en banc under Constitution of Missouri, 1945, Art. 5, § 9, V.A.M.S., namely, individual employees' rights arising under a collective bargaining agreement with an employer engaged in activities affecting interstate commerce within the meaning of and subject to the Labor Management Relations Act 1947, as amended, and that the case arises under and is governed by Section 301(a), L.M.R.A., 29 U.S.C. § 185(a).

No question involving the construction of the constitution of this state or of the United States, or the validity of a treaty or federal statute, or any authority

exercised under federal laws,[1] was raised or involved in the original submission of this case, either in the trial court or in this court, until after the opinion of this court was handed down. The attempt to inject a federal question for the first time in the motion for rehearing came too late to secure a transfer to the court en banc, under our practice and procedure.

Respondents further contend that in construing this collective bargaining agreement local state law instead of applicable federal substantive law was improperly applied; that the principles and precepts of federal labor law and policy must be observed; that the context in which this agreement was negotiated and the purpose it was intended to serve should have been considered; that collective bargaining agreements are federal contracts which are conceptually different from other contracts and subject to different approaches in their construction and enforcement. It is urged that the interests and positions of respondents were not considered; that the obvious intendment and purpose of Article XI was overlooked; that federal labor law and policy require a construction favorable to the demands of respondents; that the courts should interpolate terms which might have been but were not included in the agreement, so as to effectuate the policies of federal labor law and accomplish the "evident aims and purpose" of the agreement, where necessary; that respondents' interpretation of the agreement is "in accord with substantive federal law," and that we should rule in respondents' favor because our construction of the agreement can only breed discontent and inharmonious relations between employers and employees, constitute a source of unnecessary and disrupting litigation, and have an unsettling effect upon the negotiation and administration of collective bargaining agreements throughout the country.

The suggestion that federal labor policy and federal substantive law governs the construction of this agreement is a new theory, introduced into this litigation for the first time on the motion for rehearing. As indicated, the case was not submitted on any such theory, either in the trial court or in this court. No reference was made in respondents' brief on appeal to federal law, in urging us to adopt their interpretation of Article XI. Both sides treated all questions for decision as questions arising under local law and determinable by local law. New propositions and complaints, not made in the original briefs, Ford v. Wabash Ry. Co., 318 Mo. 723, 300 S.W. 769, 778, and raised for the first time after the opinion is handed down by the Supreme Court, Phippin v. Missouri Pac. R. Co., 196 Mo. 321, 93 S.W. 410, 418, or which are clearly afterthoughts, State ex rel. Cole v. Matthews, en banc, Mo.Sup., 274 S.W.2d 286, 292, ordinarily will not be considered on motion for rehearing. We will consider the matter, however, sufficiently to point out the following: Although on original submission respondents cited no federal cases, but only Missouri cases and cases from other states, and on this motion for rehearing have not cited any federal cases construing a provision similar to Article XI, our original research, and our research on this motion for rehearing, was conducted in the case law of both hierarchies, state and federal. We have found no federal cases construing such a provision or a similar provision and we are of the opinion that there are no ruling cases in the federal courts applying any different rule or reaching any different result on comparable facts. Respondents have not shown that our decision is contrary to any federal de-

---

1. These are the standards by which we determine whether there is a "federal question" requiring transfer. McAllister v. St. Louis Merchants' Bridge Terminal Ry. Co., 324 Mo. 1005, 25 S.W.2d 791; Huckleberry v. Missouri Pac. R. Co., 324 Mo. 1025, 26 S.W.2d 980, 988; Pashea v. Terminal R. Ass'n of St. Louis, 350 Mo. 132, 165 S.W.2d 691, 696; State ex rel. Perrine v. Keirnan, 361 Mo. 871, 237 S.W.2d 156.

cisions on this subject. We consider our decision not inconsistent with the existing body of federal law. The parties were accorded a review of the provisions of the contract under applicable law on the merits in accordance with accepted principles of construction and on the basis of what the parties said in their agreement. Neither respondents, nor appellant, were entitled to prevail on the basis of what they intended to say or might have said, or on the basis of the effect a certain construction may have upon industrial peace, nor on any basis except the merits of their contentions.

Nothing said in Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246, or in any of the other United States Supreme Court decisions cited in respondents' suggestions, militates against the conclusions we have reached. In none of these cases was there a question of construction analogous or similar to that presented in this case. Assuming that we are obliged to follow and apply federal substantive labor law and policy, the United States Supreme Court has not issued any universal ukase that in all cases of disagreement between the parties to collective bargaining agreements federal labor law and policy dictates that the position of the labor union shall be sustained arbitrarily or that the preservation of harmonious labor relations requires the capitulation of employers in all cases where questions of interpretation arise, regardless of the merits of the case, but this is what respondents seem to imply.

Having decided this case on its merits we do not conceive it to be our function to sustain respondents' position in this case willy-nilly, "lest it be summarily returned to this Court by the Supreme Court of the United States," as respondents' counsel warn on page 12 of their suggestions.

 Respondents' contentions that we misinterpreted the law in holding that the General Laws were not incorporated into the agreement; in applying improper principles of review; in holding that the motion for a directed verdict should have been sustained; in ruling that permanent suspension of publication cannot be interpreted to mean permanent suspension of printing; in holding that Article XI means corporate merger or consolidation by appellant; in holding that permanent suspension of publication meant to go out of business as a publisher of a newspaper; in invading the province of the jury by construing the language of Article XI; and in failing to consider controlling decisions of local law with which this opinion is said to conflict, constitute mere reargument of issues determined by the opinion. Under Sup.Ct.Rule 83.16, V.A.M.R. reargument of such issues will be disregarded. We have carefully examined these contentions seriatim and have satisfied ourselves that no matters of law or fact have been overlooked or misinterpreted. The motion for a rehearing or to transfer is overruled.