ST. LOUIS TYPOGRAPHICAL UNION
NO. 8, AFL–CIO, an unincorporat-
ed association, Plaintiff,

v.

The HERALD COMPANY, d/b/a Globe-
Democrat Publishing Company, a
corporation, Defendant.

No. 64 C 89(3).

United States District Court
E. D. Missouri, E. D.

Oct. 13, 1967.

Bartley, Siegel & Bartley, Clayton, Mo., for plaintiff.

Lon Hocker, of Hocker, Goodwin & MacGreevy, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

REGAN, District Judge.

This Section 301[1] action, tried to the Court, was brought by St. Louis Typographical Union No. 8, AFL–CIO (Union) to recover on behalf of some 154 members certain benefits (now narrowed to severance pay and pension rights) to which such members were allegedly entitled under the terms of a collective bargaining agreement.

The Union is a labor organization which was the collective bargaining representative of employees engaged in composing room work for two St. Louis newspapers. It entered into collective bargaining agreements with the St. Louis Newspaper Publishers' Association which acted for the Globe-Democrat Publishing Company (Globe-Democrat) and the Pulitzer Publishing Company (Pulitzer) publisher of the St. Louis Post-Dispatch (Post-Dispatch). The agreement immediately involved, effective January 1, 1958 and admittedly binding upon Globe-Democrat, was for a two year period.

One of the Articles of this contract related to severance pay. It set forth that "[i]n the event of merger, consolidation or permanent suspension of publication of any newspaper covered by this contract, all employees who lose employment thereby shall receive severance pay as follows: * * *." The claim to severance pay is based upon plaintiff's interpretation of this Article. Defendant urges that irrespective of plaintiff's theory of recovery plaintiff is precluded, under principles of res judicata, from recovering in any event. Limitations is another affirmative defense.

On February 21, 1959 at 3 a. m., the St. Louis Newspaper Guild, another labor organization (not connected with plaintiff), struck Globe-Democrat and estab-

1. 29 U.S.C. § 185.

278

lished a picket line which was honored by plaintiff and its members. The contract with plaintiff granted its members the right to refuse to cross the picket line. On February 22nd the Union was notified that any of its employee members who reported for duty during the continuance of the strike would be put to work and paid his regular day's pay. The strike and picketing continued until May 31, 1959, when the Guild settled its dispute with Globe-Democrat. In the interim, the Globe-Democrat's newspaper was not published and the member-employees did not report for duty.

On February 27, 1959, Pulitzer purchased from Globe-Democrat the building which housed its printing plant and general offices, as well as its printing equipment and certain other personal property. As part of the purchase agreement, Pulitzer temporarily leased back to Globe-Democrat certain portions of the building for the period from February 27, 1959 to May 31, 1959. In conjunction with Pulitzer's acquisition of the Globe-Democrat property, the parties entered into a contract under the terms of which Pulitzer agreed to print the Globe-Democrat's newspaper for a period of ten years upon the resumption of publication by the Globe-Democrat following settlement of the existing Guild strike.

The February 27, 1959 agreement provided for the retention by both parties of their separate identities and their separate news, circulation and advertising policies. Pulitzer was to pay all printing expenses from the point where the copy was received by it to the delivery of the printed newspapers at the truck side of the loading dock, and at that point the Globe-Democrat was to accept and be responsible for the delivery of the printed newspapers.

After the date Pulitzer was to begin printing the Globe-Democrat's newspaper it was to be liable only for wages and other employee benefits which were incurred thereafter in the printing of the newspaper, no liability being imposed upon it for obligations to Globe-Democrat employees incurred prior to such date.

Pulitzer further agreed to employ from the then present employees of Globe-Democrat, if available, any additional persons as it might need to print Globe-Democrat's newspaper, but without obligation to employ any of such persons whose services were not actually needed.

On the same day the agreement with Pulitzer was entered into, Globe-Democrat notified its employees of the "consolidation of mechanical operations" of the two newspapers, stressing the independence of the two publishers and noting that consolidation of mechanical operations by competing newspapers was a growing trend in the United States. This notice stated that members of the mechanical unions (of which plaintiff was one) would be employed on a priority basis in the consolidated mechanical operations, and if they could not be so employed "the dismissal provisions of the current mechanical contracts would apply."

After the Guild strike was settled, Pulitzer began printing the Globe-Democrat's newspaper and is still doing so. None of the employees for whose benefit this action was brought performed any work for, received any compensation from, or were called back to work after February 27, 1959. However, they did continue to receive Blue Cross and Blue Shield insurance benefits for some time thereafter, at least until June 1, 1959. All of them were on the last priority (or seniority) list of the Globe-Democrat chapel of the Union, which was made up in February, 1959. The priority list shows when each member of the Union became an employee of Globe-Democrat. None of these names appeared on the priority list at the Post-Dispatch chapel as late as May 25, 1959. A Union member employed by the Globe-Democrat could not have priority with more than one newspaper at the same time, and if an employee lost his priority standing at Globe-Democrat and was employed at some other newspaper, his priority would commence as of the date of his employment by the second employer and his priority prior to February 27, 1959 would

be lost. The Globe-Democrat employees who were employed at the Post-Dispatch after February 27, 1959 were placed at the bottom of the Post-Dispatch priority list. Subsequently, a new priority list was made up by the Post-Dispatch chapel purporting to show all of the former Globe-Democrat employees who had become employees of the Post-Dispatch with a priority date as of February 27, 1959. Some, but not all, of them had been employed at the Post-Dispatch at irregular intervals on a temporary basis prior to the resumption of the publication of the Globe-Democrat. The Post-Dispatch, however, never acquiesced in this new priority list, and we find that it does not correctly state the facts. Under the great weight of the evidence, the Union members did not cease to be employees of the Globe-Democrat until about June 1, 1959. This finding is consistent with a statement in Plaintiff's Exhibit No. 4 (which was lodged and is now received in evidence), although our finding is made independently of that Exhibit.

We first direct our attention to the defense of statute of limitations. This necessitates a statement of additional facts.

On December 30, 1963, Globe-Democrat was dissolved and pursuant to its liquidation all of its assets and liabilities were assumed by The Herald Company, it sole stockholder. On the same day, The Herald Company registered the name Globe-Democrat Publishing Company as the fictitious name under which it was transacting business. The registered office of defendant was at the same address as the dissolved corporation, Globe-Democrat, at which said dissolved corporation had operated. The Herald Company, operating under said fictitious name in all respects in the same manner as had Globe-Democrat, continued the publication of the same newspaper with no outward change.

The present suit was brought on February 26, 1964, naming as defendant the Globe-Democrat Publishing Company, and service was had on defendant's business manager. Thereafter, on March 5, 1964, an amended complaint was filed in which, with the consent of defendant, The Herald Company was substituted as defendant and the dissolved corporation was dropped as a party.

The defense of limitations is based on the theory that plaintiff's claim accrued on February 27, 1959, and that inasmuch as The Herald Company was not made a party to this action until after five years elapsed, the action is barred by the Missouri 5-year statute of limitations (Section 516.120, R.S.Mo., V.A.M.S.).

■■ It is now settled that the timeliness of a § 301 action "is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations." International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), AFL–CIO v. Hoosier Cardinal Corp., 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192. Assuming, as would appear to accord with *Hoosier,* but without deciding, that the 5-year statute is the governing one, we are nevertheless of the opinion that this action as it relates to the claim for severance pay accrued less than five years before The Herald Company was substituted as the defendant.

It is true that the complaint alleges that from and after February 27, 1959 (the date of the contract with Pulitzer) Globe-Democrat and defendant have not employed any members of the Union to perform composing room work, and that the member-employees "lost their employment with the Globe-Democrat Publishing Company on February 27, 1959, as aforesaid." However, the evidence, most of which came in without objection or was stipulated, is convincing, as we have found, that in truth and in fact the member-employees remained employees of Globe-Democrat until June 1, 1959, so that their right of action for severance pay could not have accrued before then.

■ Plaintiff has requested leave to amend the Second Amended Complaint to conform to the evidence. Although the defendant has objected to this request,

it has wholly failed to demonstrate any prejudice in fact which would result from the allowance of the amendment. In the interest of justice we sustain the motion of plaintiff and permit the complaint to be amended as requested. Limitations is, of course, an affirmative defense, and in our judgment there is virtually no proof whatever, other than the misstatements in the second amended complaint and the prior complaints, which supports such defense. We find against defendant on this issue, at least in respect to plaintiff's claim for severance pay.

After publication of the Globe-Democrat's newspaper was resumed, plaintiff made a futile demand upon Globe-Democrat for severance pay on behalf of its members who had lost their employment. Suit was then instituted in the Circuit Court of the City of St. Louis by all such employee members, who collectively sought to recover severance or dismissal pay under the formula provided for in the collective bargaining agreement. This state court action, Ackerman v. Globe-Democrat Publishing Company, Mo., 368 S.W.2d 469, referred to as *Ackerman,* was tried to a jury which returned a verdict in favor of the employees in the sum of $234,707.80, plus interest. On appeal to the Missouri Supreme Court, the resulting judgment was reversed and judgment was thereafter entered in favor of Globe-Democrat.

The Missouri Supreme Court, construing the contractual article relating to severance pay, held that even though the parties may in fact have intended to cover loss of employment in every conceivable aspect, including "the situation that actually came to pass", the language employed in the collective bargaining agreement to accomplish this objective was not sufficiently comprehensive to achieve that purpose. Certiorari to the United States Supreme Court was sought and denied (375 U.S. 949, 84 S.Ct. 353, 11 L.Ed.2d 276), and the ruling of the Missouri Supreme Court is now final.

■ The parties are in accord that the final judgment of a court of competent jurisdiction is conclusive and precludes the prosecution of a second action by the same parties (or those in privity with them) on the same claim. Plaintiff's post-trial brief concedes that "with respect to plaintiff's claim for severance pay, the *cause of action is the same* in the instant suit as it was in the *Ackerman* case." However, plaintiff takes the position that res judicata has no application, first, because "the law under which the first judgment was obtained is different from that applicable to the second action, and there has in addition been an intervening decision, or a change in the law, between the time of the first judgment and the instant action, and second, because the parties to the said suit, are not in fact or in law, the same."

■■ We find no merit to the contention, which plaintiff states is the "most compelling", that res judicata does not apply as a bar because the law which governs this action is different from that under which the earlier judgment was lost. It is plaintiff's theory that "this is an action to be determined under federal law, while the *Ackerman* suit was determined under state contract law." However, both suits are actions for breach of the same contractual provision, and the decisive issue in each, so far as the merits are concerned, is the construction to be given to the language of the collective bargaining contract. The right allegedly violated and the legal wrong asserted are the same in each case. That is, in *Ackerman* the cause of action was based on certain conduct of Globe-Democrat at a particular time and the legal effect of such conduct in the light of the severance pay article of the contract. The Missouri Supreme Court entered final judgment on the merits of that specific claim adverse to the employees who asserted it. Here, the very acts and conduct which were involved in the earlier case are now submitted to this Court in an endeavor to persuade us to reach a different result. This we cannot do. A court of competent jurisdiction decided that Globe-Democrat did not breach the severance pay provision of the collective bargaining agreement. That judgment,

long since final, is conclusive and binding between the parties and their privies in respect to the cause of action litigated. Towle v. Boeing Airplane Company, 8 Cir., 364 F.2d 590; Goldsmith v. M. Jackman & Sons, Inc., 10 Cir., 327 F.2d 184.

As respects the claim for severance pay, the employees entitled thereto had but one cause of action. "The assertion of a different legal theory in the second complaint is not the same as the urging of a separate and distinct cause of action." McCarthy v. Noren, 9 Cir., 370 F.2d 845, 847. The Globe-Democrat employees are no more entitled to the relitigation of their single claim for severance pay upon a different legal theory than they would be if new evidence relating thereto, conclusive in effect, had become available after the first judgment became final. There must be an end to litigation, and the doctrine of res judicata was devised and is enforced for this purpose.

■ We also find without substance plaintiff's claim that there has been a "change in the law." The only so-called "change" to which we have been cited is the removal of the "underpinnings" of Association of Westinghouse Salaried Employees v. Westinghouse Electric Corporation, 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510. Even Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246, which plaintiff cites for this purpose (decided December 10, 1962 before the submission of the appeal in Ackerman and one month before the employees' brief was to be filed in the Missouri Supreme Court), notes that "Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 [decided June 3, 1957], has long since settled that § 301 has substantive content and that *Congress has directed the courts to formulate and apply federal law to suits for violation of collective bargaining contracts."* Hence, the law—that is, the applicability of federal law to suits for violation of collective bargaining agreements—was no different before than after *Ackerman* was even filed, much less decided.

It is true that *Smith* was the first definitive Supreme Court decision which sanctioned a § 301 suit by an individual employee seeking damages for breach of the collective bargaining contract, but it occurs to us that what Smith was successful in doing, Ackerman could also have attempted. Certainly, the basic *statutory* law was not changed between the *Ackerman* decision and the institution of the present action. What was changed, if anything, was the approach taken by some courts in the consideration of such claims.

Of importance also is the fact in every case in which the United States Supreme Court has held that federal, not state, law should govern § 301 actions, it did so in the *original* case. See, for example, Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, to the effect that in such cases *"incompatible* doctrines of local law must give way to principles of federal labor law." At 369 U.S. l. c. 102, footnote 10, 82 S.Ct. l. c. 576, the Court lists a number of state court cases which had found no conflict between state and federal law on the issues there presented, just as was the situation in *Ackerman* on rehearing. If there is error in *application* of the governing principles of law, the error must be rectified in the case in which it occurs, not by the institution of a new suit by the losing party for the purpose of relitigating the claim.

And although the member-employees submitted their severance pay claims for a decision in *Ackerman* on the theory the contract was to be construed under state local law and the Missouri Court initially did so, it is significant that in ruling the motion for rehearing the Missouri Supreme Court specifically held that "(w)e consider our decision not inconsistent with the existing body of federal law." (368 S.W.2d l. c. 481). In answer to similar contentions made by the plaintiff employees in a companion case respecting the application of federal labor law, the Missouri court said, "Assuming, therefore, that in this suit we were required to

apply federal substantive law, it is our conclusion that we did so and that we did so correctly * * * and plaintiffs certainly have not demonstrated that on the merits we reached an incorrect result." Irwin v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 452, 459, cert. den. 375 U.S. 908, 84 S.Ct. 198, 11 L.Ed.2d 147. Thus, it appears that the decision (and the local law) was deemed by the Missouri Court to have been in accord with principles of federal substantive labor law. Such was the plaintiffs' theory in applying for certiorari to the United States Supreme Court. Hence, we cannot now confidently state that the ultimate decision of the Missouri Court was not based upon its conception of federal substantive labor law, if applicable.

■ What plaintiff is really saying is no more that that the Missouri Supreme Court erroneously construed the contract and was mistaken in finding no conflict between state and federal law. However, even if this were so, the rule is well settled that an erroneous adjudication of a court of competent jurisdiction is as binding and conclusive as a correct one. Paull v. Archer-Daniels-Midland Company, 8 Cir., 313 F.2d 612, 617; Matthews v. Wolvin, 5 Cir., 266 F.2d 722, 729; Goldsmith, supra.

■ The second reason which plaintiff urges to support its position that res judicata does not bar the present action, namely, that the parties plaintiff in the two suits are not the same, is without merit. It is, of course, true that the Ackerman case was one in which all of the member-employees of Globe-Democrat themselves sought recovery individually and collectively, whereas the instant action is by the Union for the benefit of the same individuals. However, the Union has no beneficial interest in any possible recovery. Although its right to sue is granted by the federal law, it prosecutes the present suit solely as the agent or representative of those who would receive the proceeds of any recovery.

Plaintiff argues the Union is suing here "both as an entity and in behalf of certain of its members, for the Union has certain institutional interests in maintaining the integrity of the collective bargaining agreement negotiated by it beyond the benefits accruing thereunder to those covered by the contract." Nothing we have said in any wise impairs the right of the Union as an entity to maintain the integrity of the contract. What we do hold is that when it sues as agent, in behalf of its members, the rights asserted are those of its members. Assuming that the Union also has a claim on its own behalf for breach of contract (no doubt barred by now by limitations), no such claim is here involved.

It is interesting to note that in St. Louis Mailers' Union Local No. 3 v. Globe-Democrat Publishing Company, 8 Cir., 350 F.2d 879, as here, that union brought an action after the unsuccessful termination of a similar state court suit by its member-employees (Monterosso v. St. Louis Globe-Democrat Publishing Co., Mo., 368 S.W.2d 481, cert. den. 375 U.S. 908, 84 S.Ct. 198, 11 L.Ed.2d 147). There the similarity ends. The union's later action for breach of contract did "not concern individual rights of the Local's members and has to do with nothing more than the Local's own asserted claim as a union." [2] Here, as distinguished from St. Louis Mailers' Union, the Union chose not to assert its own possible claim for breach of contract (or even to seek arbitration), as it might have done. No damages are sought for violation of its own interests. Instead it now

2. In the district court the parties agreed that the "individual rights, under the collective bargaining agreement, of plaintiff's members who formerly were employed by defendant are forever foreclosed by the judgment in Monterosso."

The members of four unions prosecuted suits against Globe-Democrat for severance pay as the result of the contract with Pulitzer. In addition to Irwin, Monterosso and Ackerman, a similar ruling rejecting the member-employees' claims was made in Allen v. Globe-Democrat Publishing Company, Mo., 368 S.W.2d 460. So far as we are aware, plaintiff in the instant case is the only union which disputes the preclusive effect of the state court judgment.

champions the claims of its members alone.[3] We cannot accept the proposition that Union members are entitled to two opportunities to recover contractual benefits, and that an employer who successfully defends an action by its employees may again be subjected to a suit on the same claim by the employees' agent.

Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580, cited by plaintiff, is wholly inapposite. What that case held was simply that the employee could not sidestep available grievance procedures and prosecute his individual lawsuit without first affording the union the opportunity to resolve the dispute on his behalf under the *grievance* procedures provided for in the collective bargaining agreement. The decision was in the original action. The only question there involved was whether federal labor policy requires an employee claiming severance pay to exhaust the contract grievance procedures before seeking direct legal redress. In deciding that question, the Court stressed the interest of the union in handling grievance claims under the method provided for in the contract. However, there is not the slightest intimation in *Republic Steel* that once arbitration is exhausted or waived, the union would have a right to prosecute a second lawsuit on behalf of an employee after the employee's own court action has resulted in an adverse decision on the merits.

Plaintiff relies upon Troxell v. Delaware, Lackawanna & Western Railroad Company, 227 U.S. 434, 33 S.Ct. 274, 57 L.Ed. 586 to support its contention that res judicata has no application. We find no similarity between *Troxell* and the factual situation here present. *Troxell* held that an adverse judgment in an action brought by a widow in her individual capacity to recover damages from an interstate carrier for the death of her husband, tried under a state law under which no recovery could be had for the negligence of a fellow servant of the decedent, did not bar a subsequent action by the widow as administratrix of her husband's estate which she brought against the carrier under the Federal Employers' Liability Act.

Of the two bases for the *Troxell* decision, the first was that "a denial of recovery under a state *act* was no barrier to a suit under a federal *act* for the same injury" (the cause of action being a different one). Mr. Justice Douglas, dissenting, in Magnolia Petroleum Co. v. Hunt, 320 U.S. 430, 448, 64 S.Ct. 208, 218, 88 L.Ed. 149. Here, the employees were not denied recovery under a state *statute*. They were denied recovery simply because the contract, as construed by the Missouri Supreme Court, was not breached.

The second ground on which *Troxell* was decided was that there was not the requisite identity of parties in the two actions. On authority of its earlier ruling in American Railroad Company of Porto Rico v. Birch, 224 U.S. 547, 32 S.Ct. 603, 56 L.Ed. 879 the Supreme Court held that there "was not that identity of parties in the former action * * * and the present case, *properly* brought by the administratrix under the employers' liability act, which renders the former suit and judgment a bar to the present action." What the *Birch* case had held was that the individual beneficiaries had *no right of action at all* under the Employers' Liability Act and that the sole cause of action, if the conditions of liability existed, was given to the

---

3. At the trial of this case, the president of the Union testified on cross-examination as follows (Tr. 56):

"Q All right. Let me ask you more specifically. Is there anything left that the Union has as an entity, wants to get out of this lawsuit?

A No, not that I know of.

Q That's right. And whatever you are attempting to recover in this lawsuit is for the benefit of the members of the Union who formerly worked for the Globe-Democrat; is that right?

A That's correct.

Q And whatever amount that you recover here, if any, you will turn over to them in accordance with their interest; is that correct?

A In accordance; that's correct."

personal representative only. In the Court's view, the federal *statute* clearly differentiated between the parties entitled to sue and the parties to be benefited by the suit, and it was the duty of the Court to give effect to this purpose of Congress. A judgment for the beneficiaries in *Birch* was therefore reversed without prejudice to the right of the personal representative to bring a proper action.

In the first suit involved in *Troxell*, the only cause of action which either was or could have been prosecuted by her was granted, under state law, to her as an individual. In the second suit, the only cause of action which was or could have been prosecuted was that created by the federal statute and which was granted to the personal representative. Hence, since the parties in whom the cause of action was *vested* were different, the parties prosecuting the actions could not have been the same. In any event, the present situation does not involve two suits by the same person in different capacities.

At the very least, we believe that within the meaning of that term as it is used in the law of res judicata, the plaintiffs in *Ackerman* and the present plaintiff are in privity. It is, of course, well settled that the doctrine applies not only to the actual parties to the first litigation, but also to all persons in privity with them. "The term 'privity' is an elusive concept, without any precise definition of general applicability. It is not necessary, however, for us to explore all its subtleties here. It is sufficient that the word designates a person so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." Jefferson School of Social Science v. Subversive Activities Control Board, 118 U.S.App. D.C. 2, 331 F.2d 76, 83. That the Union which now sues on behalf of its members represents "precisely the same legal right in respect to the subject matter involved" as did the employees themselves cannot realistically be disputed.

Nor is the present a case in which the employees had two rights of action, one under a federal statute and one under a state law. The employees had but *one* cause of action, and that action could be brought in either the federal or state court, Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 and could be prosecuted *either* by the individual employees or by the Union as their representative.

A court of competent jurisdiction having decided that Globe-Democrat did not breach the severance pay provision of the collective bargaining agreement, we hold that plaintiff's claim for severance pay is barred by principles of res judicata.

Having sustained defendant's res judicata defense, it is unnecessary for us to determine what construction should be given under federal labor law to the severance pay provision of the collective bargaining agreement. We note in this connection that plaintiff presented no evidence whatever of what was discussed or agreed to in the bargaining sessions which led to the choice of language in the agreement, nor any evidence bearing upon the understanding in the industry of the language employed. Similar deficiencies in proof, at least in part, are noted in the *Ackerman* decision, supra.

In effect, plaintiff asks this court to take judicial notice (without supporting evidence) not only of what the Union representatives sought to achieve but of what they actually orally agreed upon with the employer representatives at the time the collective bargaining agreement (subsequently reduced to writing) was negotiated. This we cannot do.

In our examination of the collective bargaining agreement we have noted that Article II thereof provides a means for the final and binding decision of any dispute which might arise "regarding the interpretation or enforcement of any of the provisions" of the contract. Even plaintiff must concede that federal labor policy favors the settlement of disputes through the machinery

of arbitration and requires that contract grievance procedures be resorted to, where possible. Yet for reasons of which we are not advised, the arbitration provision in the contract was waived by the parties in *Ackerman* (with the acquiescence of the Union which assisted in preparing evidence and paid the expenses incurred in prosecuting that suit). Cf. St. Louis Mailers' Union, supra, 350 F.2d l. c. 883, footnote 2.

As a Court we have no knowledge of industry practices and understandings. The "common law of the industry" is not known to us, and the evidence does not enlighten us with respect thereto. The very fact that a collective bargaining agreement calls into being the "common law of the industry", United Steelworkers of America, etc. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579, 80 S.Ct. 1347, 4 L.Ed.2d 1409, reinforces our view that arbitration should have been resorted to. "The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." Warrior & Gulf, supra, 363 U.S. l. c. 581, 80 S.Ct. l. c. 1352. See also United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed.2d 1403. Had the parties followed the provisions of Article II resolving their dispute "regarding the interpretation" and alleged violation of the severance pay provision, the present controversy would long since have been terminated and years of litigation would have been avoided.

We turn next to plaintiff's claim for pension benefits. This claim is based upon an oral agreement allegedly entered into in April, 1956, at the same time a collective bargaining agreement was being negotiated with the St. Louis Newspaper Publishers' Association.

Plaintiff's theory is that by entering into the February 27, 1959 contract with Pulitzer, Globe-Democrat breached the 1958 collective bargaining agreement which provided that the publishers shall "make no other contract" covering the composing room work which was to be performed by the member-employees, and that by so contracting, Globe-Democrat prevented the member-employees from exercising their rights to obtain the pension benefits.

There is a serious question as to whether, under plaintiff's theory, the pension claim would be barred by limitations, the breach, if any, having taken place February 27, 1959. The problem here involved is unlike that pertaining to severance pay, which is payable only upon the actual termination of employment as the result of the February 27, 1959 contract. Another question is whether the oral agreement is subject to the Missouri statute of frauds (Sec. 432.-010, R.S.Mo., V.A.M.S.) since it could not be performed within a year (at least as to all but a handful of employees). See Hamilton Foundry & Mach. Co. v. International Molders & Foundry Workers Union of North America, 6 Cir., 193 F.2d 209, cert. den. 343 U.S. 966, 72 S.Ct. 1060, 96 L.Ed. 1363. Contra, Rabouin v. National Labor Relations Board, 2 Cir., 195 F.2d 906. We need not resolve these questions, since we find against plaintiff on the merits.

We do not believe that Globe-Democrat made a binding commitment in 1956 to pay pensions. There can be no doubt that pensions were discussed in the 1955–1956 bargaining sessions. However, at most, Globe-Democrat simply gave assurances of its good faith intention to continue on a voluntary basis the policy it was then pursuing, under which employees who retired after many years of service were granted pensions based on merit and need. Such assurances, if given, may not be equated with the assumption of a contractual obligation.

True, a number of witnesses testified that a pension agreement was orally entered into, whereby an employee 60 years of age who retired after 25 years of em-

ployment would receive a minimum pension of $60 a month, in addition to which the Globe-Democrat would continue to pay Blue Cross, Blue Shield and group life insurance premiums for the employee. These witnesses also testified that the Globe-Democrat representative declined to put the agreement into writing assigning as his only reason for such refusal the probability that a written instrument might be used as a precedent by other unions whose members were employed by Globe-Democrat, as well as by unions at other newspapers published by the same interests which controlled Globe-Democrat.

We do not hold that these witnesses deliberately falsified their testimony. However, they were testifying from memory concerning conversations which occurred almost 11 years previously. Strange to say, no memorandum relating to the conversations was made by the Union representatives, so far as the evidence discloses, nor is there any evidence that any such verbal agreement was ever submitted to or voted upon by the Union members. There is no evidence that the Newspaper Scale Negotiating Committee was other than what its name implies, or that it had been granted authority by the members or the Union constitution to enter into binding contracts either oral or written. Ordinarily, terms of employment negotiated with an employer are submitted for ratification or rejection to the membership of the union. Mahany v. Grogan, D.C.Mo., 245 F.Supp. 362, 363. The very fact that no similar pension claim was made in the *Ackerman* suit would indicate either that the Union members prosecuting that action did not believe such an oral contract had been made or that, if made, the members were not aware of it.

Under plaintiff's theory, the pension rights which were assertedly agreed upon were to continue indefinitely and long after the expiration of the two-year contract then being negotiated. In our view, a commitment so important and potentially financially burdensome would not have been agreed upon in the haphazard fashion testified to by plaintiff's witnesses. We also question whether the Globe-Democrat representatives would have been so stupid as to believe that an agreement of this nature and importance, once made known to the members of this Union, could have been kept shrouded in secrecy.[4] It occurs to us that whatever the Globe-Democrat representative may have said concerning the probable use of a pension agreement as a precedent by other unions would more likely have been the basis of a refusal to *enter* into such an agreement, rather than a refusal to comply with a request to reduce the agreement to writing. An oral pension agreement would have been a precedent for use by other unions and other locals of the Union just as would a written one.

Moreover, if such a major breakthrough as a pension plan had been orally agreed to, there would be no reasonable justification (and the evidence discloses none) for the Union to acquiesce in the employer's refusal to reduce the agreement to writing. "Section 158(a) (5) [29 U.S.C.] makes it an unfair labor practice for an employer 'to refuse to bargain collectively with the representatives of his employees, * * *.' Section 158(d) states that included within the obligation to bargain collectively is 'the

---

4. We note that Article III of the General Laws of the International Typographical Union prohibits the submission to the Union for a vote on "any understanding whatsoever which has not previously been approved by the International President as being in compliance" with the International's laws and policy. Under this provision (which implies the necessity of a vote by the members), if a verbal understanding, such as the Union witnesses testified to, was entered into, it could only have been after submission to and approval by the International president. In this situation, we fail to see how secrecy could have been maintained in any event.

execution of a written contract incorporating any agreement reached if requested by either party, \* \* \*.' " National Labor Relations Board v. Ogle Protection Service, Inc., 6 Cir., 375 F.2d 497, 500.

It is well settled that the refusal of an employer, upon request of the union, to execute and sign an agreement embodying the terms agreed upon by the parties is an unfair labor practice. H. J. Heinz Company v. National Labor Relations Board, 311 U.S. 514, 526, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Ogle Protection Service, Inc., supra. According to the Union's witnesses, they "strenuously" insisted that the pension agreement be reduced to writing, but nevertheless accepted an oral commitment simply because the interests controlling Globe-Democrat "would not allow it to be in written form." Both the employer and Union representatives must have known that whether a contract should be signed is not a bargainable issue. National Labor Relations Board v. Todd Co., 2 Cir., 173 F.2d 705, 707.

We find that no agreement was entered into which obligated Globe-Democrat to pay pensions to the Union's members employed by Globe-Democrat. It follows that we need not determine whether the provision of the later, 1958, collective bargaining agreement prohibiting the making of "any other contract" covering composing room work, in the context in which that language was employed, was breached when Globe-Democrat entered into the February 27, 1959 agreement with Pulitzer, or if so, whether such breach directly resulted in the loss of the member-employees' alleged pension benefits. Under the evidence, plaintiff is not entitled to recover.

The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of defendant and against plaintiff.